# REGAN, SECRETARY OF THE TREASURY, ET AL. *v.* TIME, INC.

No. 82-729.   Argued November 9, 1983—Decided July 3, 1984

642

WHITE, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Part II–A, in which BURGER, C. J., and BRENNAN, MARSHALL, REHNQUIST, and O'CONNOR, JJ., joined, and an opinion with respect to Parts II–B, II–C, and II–D, in which BURGER, C. J., and REHNQUIST and O'CONNOR, JJ., joined. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL, J., joined, *post*, p. 659. POWELL, J., filed an opinion concurring in part and dissenting in part, in which BLACKMUN, J., joined, *post*, p. 691. STE-

VENS, J., filed an opinion concurring in the judgment in part and dissenting in part, *post*, p. 692.

*Elliott Schulder* argued the cause for appellants. With him on the briefs were *Solicitor General Lee, Assistant Attorney General McGrath, Deputy Solicitor General Geller,* and *Richard A. Olderman.*

*Stuart W. Gold* argued the cause for appellee. With him on the brief was *Ellen S. Oran.*

JUSTICE WHITE announced the judgment of the Court and delivered the opinion of the Court with respect to Part II–A, and an opinion with respect to Parts II–B, II–C, and II–D, in which THE CHIEF JUSTICE, JUSTICE REHNQUIST, and JUSTICE O'CONNOR join.

The Constitution expressly empowers Congress to "provide for the Punishment of counterfeiting the Securities and current Coin of the United States." U. S. Const., Art. I, § 8, cl. 6. Pursuant to that authority, Congress enacted two statutes that together restrict the use of photographic reproductions of currency. 18 U. S. C. § 474, ¶ 6, and 18 U. S. C. § 504. The Federal District Court for the Southern District of New York held that those two statutes violate the First Amendment. Appellants ask us to overturn that judgment.

I

Title 18 U. S. C. § 474 was enacted during the Civil War to combat the surge in counterfeiting caused by the great increase in Government obligations issued to fund the war and the unsettled economic conditions of the time. See *United States* v. *Raynor,* 302 U. S. 540, 544–546 (1938). The sixth paragraph of that section provides criminal liability for anyone who "prints, photographs, or in any other manner makes or executes any engraving, photograph, print, or impression

in the likeness of any . . . obligation or other security [of the United States] or any part thereof. . . ." [1]

This complete ban on the use of photographic reproductions of currency remained without statutory exception for almost a century. However, during that time, the Treasury Department developed a practice of granting special permission to those who wished to use certain illustrations of paper money for legitimate purposes. In 1958, Congress acted to codify that practice by amending [2] 18 U. S. C. § 504 so as to permit the "printing, publishing, or importation . . . of illustrations of . . . any . . . obligation or other security of the United States . . . for philatelic, numismatic, educational, historical, or newsworthy purposes in articles, books, journals, newspapers, or albums . . . ." 18 U. S. C. § 504 (1). In order to "prevent any possibility of the illustrations being used as an instrument of fraud," S. Rep. No. 2446, 85th Cong., 2d Sess., 5 (1958) (hereafter S. Rep. No. 2446); H. R. Rep. No. 1709, 85th Cong., 2d Sess., 3 (1958) (hereafter H. R. Rep. No. 1709), and in an effort to avoid creating conditions which would "facilitate counterfeiting," S. Rep. No. 2446, at 5–6; H. R. Rep. No. 1709, at 3, Congress also adopted three restrictions that the Treasury Department normally imposed on those who were granted special permission to create and use such photographs. First, the illustra-

---

[1] Congress first made it a crime to "print, photograph, or in any other manner execute" an impression "in the likeness" of any United States security in 1862. Act of Feb. 25, 1862, ch. 33, §§ 6, 7, 12 Stat. 347–348. Two years later, Congress broadened the prohibition to include the making of any such print or photograph. Act of June 30, 1864, ch. 172, § 11, 13 Stat. 221–222. The statute was reenacted, with few changes, as § 5430 of the Revised Statutes of 1878, and again as § 150 of the codification of 1909. Act of Mar. 4, 1909, ch. 321, 35 Stat. 1116. The statute was reenacted once again with minor changes in the 1948 recodification of the penal laws. Ch. 645, 62 Stat. 706.

[2] Section 504 was originally enacted in 1923 to authorize certain illustrations of postage and revenue stamps. Act of Mar. 3, 1923, ch. 218, 42 Stat. 1437. The 1958 amendment was a wholesale revision of the statute.

tions had to be in black and white. Second, they had to be undersized or oversized, *i. e.*, less than three-fourths or more than one and one-half the size of the original. And third, the negative and plates used in making the illustrations had to be destroyed after their final authorized use.[3] Therefore, under the present statutory scheme, a person may make photographic reproductions of currency without risking criminal liability if the reproductions meet the purpose (numismatic,

---

[3] In full, § 504(1) provides:

"Notwithstanding any other provision of this chapter, the following are permitted:

"(1) the printing, publishing, or importation, or the making or importation of the necessary plates for such printing or publishing, of illustrations of—

"(A) postage stamps of the United States,

"(B) revenue stamps of the United States,

"(C) any other obligation or other security of the United States, and

"(D) postage stamps, revenue stamps, notes, bonds, and any other obligation or other security of any foreign government, bank, or corporation

for philatelic, numismatic, educational, historical, or newsworthy purposes in articles, books, journals, newspapers, or albums (but not for advertising purposes, except illustrations of stamps and paper money in philatelic or numismatic advertising of legitimate numismatists and dealers in stamps or publishers of or dealers in philatelic or numismatic articles, books, journals, newspapers, or albums). Illustrations permitted by the foregoing provisions of this section shall be made in accordance with the following conditions—

"(i) all illustrations shall be in black and white, except that illustrations of postage stamps issued by the United States or by any foreign government may be in color;

"(ii) all illustrations (including illustrations of uncanceled postage stamps in color) shall be of a size less than three-fourths or more than one and one-half, in linear dimension, of each part of any matter so illustrated which is covered by subparagraph (A), (B), (C), or (D) of this paragraph, except that black and white illustrations of postage and revenue stamps issued by the United States or by any foreign government and colored illustrations of canceled postage stamps issued by the United States may be in the exact linear dimension in which the stamps were issued; and

"(iii) the negatives and plates used in making the illustrations shall be destroyed after their final use in accordance with this section."

646

philatelic, educational, historical, or newsworthy), publication (articles, books, journals, newspapers, or albums), color (black and white), and size (less than three-fourths or more than one and one-half of the size of the original) requirements of § 504(1), and if the negatives and plates are destroyed immediately after use.

Over the course of the past two decades, Time, Inc., the publisher of several popular magazines, has been advised by Secret Service agents that particular photographic reproductions of currency appearing in its magazines violated the provisions of §§ 474 and 504. Despite the warnings, Time continued to use such reproductions. When the front cover of the February 16, 1981, issue of Sports Illustrated carried a photographic color reproduction of $100 bills pouring into a basketball hoop, a Secret Service agent informed Time's legal department that the illustration violated federal law and that it would be necessary for the Service to seize all plates and materials used in connection with the production of the cover. The agent also asked for the names and addresses of all the printers who prepared the cover and requested an interview with a member of Time's management. Ten days later, Time initiated the present action against the Secretary of the Treasury, the Director of the Secret Service, and others,[4] seeking a declaratory judgment that §§ 474, ¶ 6, and 504 were unconstitutional on their face and as applied to Time, as well as an injunction preventing the defendants from enforcing or threatening to enforce the statutes.

On cross-motions for summary judgment, the District Court ruled in favor of Time. 539 F. Supp. 1371 (SDNY 1982). The court first determined that Time's use of the illustrations was speech protected by the First Amendment. It then held that § 474 could not by itself pass constitutional

---

[4] In addition to the Secretary of the Treasury and the Director of the Secret Service, the defendants included the Attorney General, the United States Attorney for the Southern District of New York, and the Special Agent in charge of the Secret Service's New York Field Office.

muster because although it was enacted to protect the Government's compelling interest in preventing counterfeiting, it was overbroad.

The court concluded that the exceptions permitted by § 504 did not save the blanket prohibition because that section presented constitutional problems of its own. Focusing on the requirements that the illustration appear in an article, book, journal, newspaper, or album and that it be used for philatelic, numismatic, educational, historical, or newsworthy purposes, the court held that § 504 could not be sustained as a valid time, place, and manner regulation because it required the Government to make distinctions based on content or subject matter. The court also determined that the purpose and publication restrictions were unconstitutionally vague, observing that "[t]he determination of what is 'philatelic, numismatic, educational, historical, or newsworthy' is rife with assumption and open to varying interpretation" and that "[t]he definition of a journal, newspaper or album is anyone's game to play." 539 F. Supp., at 1390. The court thus concluded that both § 474, ¶ 6, and § 504 were unconstitutional.

Appellants sought review of the District Court's decision by invoking this Court's appellate jurisdiction under 28 U. S. C. § 1252. We noted probable jurisdiction, 459 U. S. 1198 (1983), in order to determine whether the two statutes could survive constitutional scrutiny.

## II

The District Court correctly observed that "[b]ecause of the interrelationship of Sections 474 and 504, the ultimate constitutional analysis must be directed to the impact of these sections in tandem." 539 F. Supp., at 1385. The exceptions outlined in § 504 apply "[n]otwithstanding any other provision of this chapter," including § 474. The criminal liability imposed by § 474 therefore applies only when a photographic reproduction fails to meet the requirements imposed by § 504. Thus, if the restrictions imposed by § 504

648

sufficiently accommodate Time's First Amendment interests, both statutes must be upheld. We accordingly begin our inquiry by focusing on the restrictions imposed by § 504.

A

Appellants assert that the restrictions imposed by § 504 are valid as reasonable time, place, and manner regulations. In order to be constitutional, a time, place, and manner regulation must meet three requirements. First, it " 'may not be based upon either the content or subject matter of speech.' " *Heffron* v. *International Society for Krishna Consciousness, Inc.*, 452 U. S. 640, 648 (1981) (quoting *Consolidated Edison Co.* v. *Public Service Comm'n of N. Y.*, 447 U. S. 530, 536 (1980)). Second, it must " 'serve a significant governmental interest.' " 452 U. S., at 649 (quoting *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 771 (1976)). And third, it must " 'leave open ample alternative channels for communication of the information.' " 452 U. S., at 648 (quoting *Virginia Pharmacy Board, supra,* at 771). The District Court concluded that the purpose requirement of § 504 could not be sustained as a valid time, place, and manner regulation because it discriminates on the basis of content. We agree.

A determination concerning the newsworthiness or educational value of a photograph cannot help but be based on the content of the photograph and the message it delivers. Under the statute, one photographic reproduction will be allowed and another disallowed solely because the Government determines that the message being conveyed in the one is newsworthy or educational while the message imparted by the other is not. The permissibility of the photograph is therefore often "dependent solely on the nature of the message being conveyed." *Carey* v. *Brown,* 447 U. S. 455, 461 (1980). Regulations which permit the Government to discriminate on the basis of the content of the message cannot be

tolerated under the First Amendment. *Id.*, at 463; *Police Department of Chicago* v. *Mosley*, 408 U. S. 92, 95–96 (1972). The purpose requirement of § 504 is therefore constitutionally infirm.[5]

## B

The District Court also concluded on vagueness and other grounds that limiting the exemption from the § 474 ban to likenesses of currency contained in "publications" was itself invalid. We do not address that issue, however, because there is no evidence or suggestion that Time, a publisher of magazines, has ever, or will ever, have any difficulty in meeting that requirement.[6] The validity of the publication

---

[5] Appellants do not defend the constitutionality of the purpose requirement as written. Brief for Appellants 27–28; Tr. of Oral Arg. 10–14. They ask us to construe the statute narrowly in order to avoid the constitutional conflict, contending that the references to the various purposes are merely descriptive and illustrative, rather than prescriptive and mandatory. However, appellants are unable to suggest any meaningful interpretation of the purpose requirement that would survive constitutional scrutiny. If the requirement means only that the photograph must serve some purpose, it is meaningless because every photograph serves some purpose. On the other hand, if the requirement means that the photograph must serve a purpose similar to those enumerated in the statute, it requires the type of content-based scrutiny that the First Amendment forbids. Assuming that Congress intended the language to have some meaning, we conclude that the entire purpose requirement is unconstitutional. In light of that ruling, there is no need for us to consider Time's argument that the purpose requirement is also unconstitutionally vague.

[6] JUSTICE BRENNAN seems to believe that we hold that the publication requirement can constitutionally be used to prohibit nonpublishers from ever using photographic reproductions of currency since much of the discussion in his opinion concerns the constitutionality of the publication requirement. *Post*, at 679–690. As clearly stated above, and as we reiterate here, we express no opinion as to the validity of the publication requirement since Time has failed to show that that requirement affects its conduct in any way. It may well be that a person could not constitutionally be prohibited from using a reproduction which conformed with every portion of the statute other than the publication requirement. But that is

requirement, standing alone, is therefore of only academic interest to Time. This Court, as a matter of both constitutional limitation and prudential restraint, does not sit to resolve issues that are of only passing concern to the parties.

Time nevertheless contends that the publication requirement renders the statute overbroad and subject to challenge by a publisher such as Time. *Kolender* v. *Lawson,* 461 U. S. 352, 358–359, n. 8 (1983); *New York* v. *Ferber,* 458 U. S. 747, 768–769 (1982); *Schaumburg* v. *Citizens for a Better Environment,* 444 U. S. 620, 634 (1980); *Broadrick* v. *Oklahoma,* 413 U. S. 601, 612-616 (1973); *Thornhill* v. *Alabama,* 310 U. S. 88, 98 (1940). The essence of Time's argument seems to be that even if publishers may constitutionally be required to conform to the other requirements of § 504, that section is overbroad because it unconstitutionally precludes nonpublishers from making reproductions of currency even though they meet the other requirements of the statute. However, such an overbreadth challenge can be raised on behalf of others only when the statute is substantially overbroad, *i. e.,* when the statute is unconstitutional in a substantial portion of the cases to which it applies. *New York* v. *Ferber, supra,* at 770; *Broadrick* v. *Oklahoma, supra,* at 615. How often the publication requirement will

---

an issue which must be raised by someone who has been, or will be, precluded from using such a reproduction for that reason.

JUSTICE BRENNAN also suggests that we should decide whether the publication requirement is invalid on the basis that it is inextricably intertwined with the unconstitutional purpose requirement. However, Time has not made that argument. Time argues that the publication requirement is unconstitutional because it is vague and overbroad, not that it should be struck down because Congress would never have included the requirement in the statute in the absence of the purpose requirement. Given the fact that we hold that, even in the absence of both the purpose and publication requirements, the color and size requirements can constitutionally be applied to Time, *infra,* at 656, 658–659, and that Time has made no showing that the validity of the publication requirement by itself is of any interest to it, we see no need to reach out and decide the latter issue on our own.

be used to prevent a person from utilizing an otherwise legitimate photograph is not clear from the record before us. In describing the noncounterfeiting uses to which photographic reproductions of currency could be put, the House and Senate Committees referred only to situations in which publications were involved.[7] In light of the paucity of evidence to the contrary,[8] we may assume that the legitimate reach of

---

[7] The Committees observed that photographic reproductions of currency could be used for many legitimate purposes. "Publishers of textbooks often desire to use illustrations of United States savings bonds and postal money orders, for example, in school textbooks. Collectors of old paper money likewise wish to use illustrations of such money in articles relating to their issue and in collector's catalogs. Historians similarly want to use illustrations of paper money to picture the currency in circulation during a particular historical period. Newspapers quite often publish pictures of paper money or checks in connection with news articles . . . ." S. Rep. No. 2446, at 5; H. R. Rep. No. 1709, at 3.

[8] Time cites one instance in which a person may have been prevented from utilizing a photographic reproduction of currency because it failed to appear in one of the enumerated publications. *Wagner* v. *Simon,* 412 F. Supp. 426, 431, n. 6 (WD Mo. 1974), aff'd, 534 F. 2d 833 (CA8 1976). But one arguably unconstitutional application of the statute does not prove that it is substantially overbroad, particularly in light of the numerous instances in which the requirement will easily be met. See n. 7, *supra.*

JUSTICE BRENNAN maintains that we misconstrue the overbreadth doctrine by focusing on the one prior instance in which the statute was arguably applied in an unconstitutional manner. *Post,* at 684. However, we cite only the one example because that is the only concrete example brought to our attention by Time. There is no evidence that the Government has ever, or will ever, interpret the statute so as to prevent Polaroid snapshots of children holding currency or any of the other hypothetical activities conjured up in Time's brief. It is important to remember that the overbreadth doctrine operates as an exception to the normal rules of standing. Thus, it is up to the party invoking the doctrine to demonstrate "a *realistic* danger that the [ordinance] will significantly compromise recognized First Amendment protections of parties not before the Court." *City Council of Los Angeles* v. *Taxpayers for Vincent,* 466 U. S. 789, 801 (1984) (emphasis added). JUSTICE BRENNAN states that we should remand the case to provide Time with an opportunity to make that showing, suggesting that Time had no idea that such a showing would be required. *Post,* at 680, n. 18. This ignores the fact that it was Time, not this Court,

§ 504 "dwarfs its arguably impermissible applications" to non-publishers. *New York* v. *Ferber, supra,* at 773. Therefore, invocation of the overbreadth doctrine is unavailing to Time.

## C

The District Court concluded that because the purpose and publication requirements were unconstitutional, the entire regulatory scheme outlined in § 504 was invalid. This was error. First, as noted in Part II–B, the validity of the publication requirement is not an issue that can properly be addressed in this case. More importantly, even if both requirements were unconstitutional, it does not automatically follow that the entire statute must fail.[9]

In exercising its power to review the constitutionality of a legislative Act, a federal court should act cautiously. A ruling of unconstitutionality frustrates the intent of the elected representatives of the people. Therefore, a court should refrain from invalidating more of the statute than is necessary. As this Court has observed, "whenever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and to maintain the act in so far as it is valid." *El Paso & Northeastern R. Co.* v. *Gutierrez,* 215 U. S. 87, 96

which first argued that it had standing to challenge the publication requirement because of the overbreadth doctrine. See Brief for Appellee 41, n. 29 ("The Government . . . argues that Time has no standing to raise this issue . . . . This strategy . . . flies in the face of traditional First Amendment overbreadth analysis, under which Time is permitted to challenge § 504 on behalf of those to whom the statute would be unconstitutionally applied").

[9] JUSTICE BRENNAN seems to misconceive the premise upon which our argument is based as he goes to great lengths to establish that the publication requirement and the purpose requirement "are so completely intertwined as to be plainly inseverable . . . ." *Post,* at 677. See *post,* at 665–677. Our severability argument proceeds on the premise that both the purpose and publication requirements are unconstitutional. Thus, our entire discussion is directed at whether the color and size requirements can survive on their own.

(1909). Thus, this Court has upheld the constitutionality of some provisions of a statute even though other provisions of the same statute were unconstitutional. *Buckley* v. *Valeo*, 424 U. S. 1, 108 (1976); *United States* v. *Jackson*, 390 U. S. 570, 585–591 (1968); *El Paso & Northeastern R. Co., supra*, at 96. See also *Griffin* v. *Breckenridge*, 403 U. S. 88, 104 (1971). For the same reasons, we have often refused to resolve the constitutionality of a particular provision of a statute when the constitutionality of a separate, controlling provision has been upheld. *Champlin Refining Co.* v. *Corporation Comm'n of Oklahoma*, 286 U. S. 210, 234–235 (1932); *Southwestern Oil Co.* v. *Texas*, 217 U. S. 114, 120–121 (1910); *Field* v. *Clark*, 143 U. S. 649, 695–696 (1892). Before invalidating the entire statute, we should therefore determine whether the remaining provisions of § 504 can survive in the absence of the purpose requirement.

Whether an unconstitutional provision is severable from the remainder of the statute in which it appears is largely a question of legislative intent, but the presumption is in favor of severability. "'Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.'" *Buckley* v. *Valeo, supra*, at 108 (quoting *Champlin Refining Co.* v. *Corporation Comm'n of Oklahoma, supra*, at 234). Accord, *United States* v. *Jackson, supra*, at 585. Utilizing this standard, we are quite sure that the policies Congress sought to advance by enacting § 504 can be effectuated even though the purpose requirement is unenforceable.

One of the main purposes of the 1958 version of § 504 was to relieve the Treasury Department of the burden of processing numerous requests for special permission to use photographic reproductions of currency. The legislation was designed to "obviate the necessity of obtaining special permission from the Secretary of the Treasury in each case where the use of . . . illustrations [of currency was] desired." S. Rep. No. 2446, at 6; H. R. Rep. No. 1709, at 4. At the same time,

Congress was aware that in granting requests in the past, the Secretary had imposed size and color limitations in order "[t]o prevent any possibility of the illustrations being used as an instrument of fraud." S. Rep. No. 2446, at 5; H. R. Rep. No. 1709, at 3. Congress determined that the easiest way to ease the administrative burden without undermining the Government's efforts to prevent counterfeiting was to codify the then-existing practice, relying heavily on the Treasury Department's opinion that "the printing in publications of black-and-white illustrations of paper money . . . restricted in size will not facilitate counterfeiting." S. Rep. No. 2446, at 5–6; H. R. Rep. No. 1709, at 3. This congressional desire to ease the administrative burden without hindering the Government's efforts to enforce the counterfeiting laws can be achieved even if the purpose requirement is eliminated from the statute.[10] There is no indication that Congress believed

---

[10] JUSTICE BRENNAN seems to agree that the purpose requirement does not significantly advance Congress' express interest in easing the Treasury Department's administrative burden. *Post*, at 676–677, n. 14. Similarly, he does not dispute our conclusion that the statute can serve the other purpose expressed by Congress—to ensure that the exception would not permit counterfeiters to circumvent the law—even in the absence of the purpose requirement. Instead, he argues that Congress had some other, paramount interest in mind when it enacted the statute and that that interest cannot be achieved once the purpose requirement is struck down. This overriding congressional interest, according to JUSTICE BRENNAN, is to "permit illustrations for purposes Congress considered worthwhile." *Post*, at 673. However, nothing in the legislative history of the 1958 amendment indicates that Congress' overriding concern in expanding the purpose requirement was to promote certain worthwhile activities. There is no discussion in the legislative history concerning which activities were considered to be most worthwhile or why some activities were more worthwhile than others. Instead, the statute referred to illustrations for numismatic, educational, historical, and newsworthy purposes only because those were the types of activities for which the Treasury Department had received exemption requests in the past.

"The Treasury Department receives numerous requests for special permission to use illustrations of paper money . . . for various legitimate purposes. Publishers of textbooks often desire to use illustrations of United

that the purpose requirement either significantly eased the Treasury Department's burden or was necessary to prevent the exception from being used as a means of circumventing the counterfeiting laws. Thus, if the size and color limitations are constitutional,[11] Congress' intent can in large measure be fulfilled without the purpose requirement. We therefore examine the size and color restrictions in light of the First Amendment interests asserted by Time.

## D

In considering the validity of the color and size limitations, we once again begin with appellants' contention that the requirements are sustainable as reasonable time, place, and manner regulations. Unlike the purpose requirement, the

---

States savings bonds and postal money orders, for example in school textbooks. Collectors of old paper money likewise wish to use illustrations in articles relating to their issue and in collector's catalogs. Historians similarly want to use illustrations of paper money to picture the currency in circulation during a particular historical period. Newspapers quite often publish pictures of paper money or checks in connection with news articles, usually because of ignorance of the statutory prohibitions against the use of such illustrations.

.     .     .     .     .

"Paragraph (1) of section 504 . . . as it would be amended by the bill, will specifically permit such illustrations for numismatic, educational, historical, and newsworthy purposes *and will obviate the necessity of obtaining special permission from the Secretary of the Treasury in each case where the use of such illustrations is desired.*" S. Rep. No. 2446, at 5–6; H. R. Rep. No. 1709, at 3–4 (emphasis added).

While the legislation undoubtedly benefits those who engage in the listed activities, there is no indication that Congress enacted the legislation out of special concern for such individuals. Instead, as Time itself points out, Congress apparently acted "in response to the Treasury Department's desire to be rid of an administrative nuisance." Brief for Appellee 8. As noted above, that interest and the other interest expressed by Congress when it enacted the amendment can adequately be served even in the absence of the purpose requirement.

[11] Time does not challenge the constitutionality of the requirement that the negatives and plates be destroyed immediately after the final authorized use. *Id.*, at 9, n. 11.

size and color limitations do not discriminate on the basis of content. Compliance with the color and size requirements does not prevent Time from expressing any view on any subject or from using illustrations of currency in expressing those views. More importantly, the Government does not need to evaluate the nature of the message being imparted in order to enforce the color and size limitations. Those limitations restrict only the manner in which the illustrations can be presented. They are thus similar to the decibel level restrictions upheld by this Court in *Kovacs* v. *Cooper*, 336 U. S. 77 (1949), and the size and height limitations on outdoor signs upheld by other courts, *Baldwin* v. *Redwood City*, 540 F. 2d 1360, 1368–1369 (CA9 1976), cert. denied *sub nom. Leipzig* v. *Baldwin*, 431 U. S. 913 (1977); *Temple Baptist Church, Inc.* v. *City of Albuquerque*, 98 N. M. 138, 146, 646 P. 2d 565, 573 (1982); *Krych* v. *Village of Burr Ridge*, 111 Ill. App. 3d 461, 464–466, 444 N. E. 2d 229, 232–233 (1982). Therefore, the size and color limitations pass the first of the three requirements of a valid time, place, and manner regulation.

The size and color limitations also meet the second requirement in that they effectively serve the Government's concededly compelling interest in preventing counterfeiting. Time contends that although the color restriction serves the Government's interest in preventing counterfeiting, it is nonetheless invalid because it is not narrow enough. Time asserts that the color restriction applies to an illustration of currency regardless of its capacity to deceive and is thus broader than is necessary to achieve the Government's interest in preventing counterfeiting. However, Time places too narrow a construction on the Government's interest and too heavy a burden on those enacting time, place, and manner regulations. The Government's interest in preventing the color photographic reproduction of currency is not limited to its desire to prevent would-be counterfeiters from utilizing the illustration itself. The requirement that the illustration be in

black and white is also designed to make it harder for counterfeiters to gain access to negatives that could easily be altered and used for counterfeiting purposes. Only one negative and plate is required for black-and-white printing. On the other hand, the color-printing process requires multiple negatives and plates. This increases a counterfeiter's access to the negatives and plates and enables him to more easily use them for counterfeiting purposes under the guise of a legitimate project. In opposing a recent bill designed to eliminate the color restriction, a Treasury Department official noted these concerns, stating that "[t]he size restriction alone does not address the problem of widespread possession of color separation negatives, nor does it impact upon the availability of a ready-made alibi for the possessors." Statement of the Honorable Robert E. Powis, Deputy Assistant Secretary of the Treasury, before the Subcommittee on Criminal Justice, House Judiciary Committee on H. R. 4275, reprinted in App. D to Juris. Statement 43a. It is therefore sufficiently evident that the color limitation serves the Government's interest in a substantial way. That the limitations may apply to some photographs that are themselves of no use to counterfeiters does not invalidate the legislation. The less-restrictive-alternative analysis invoked by Time has never been a part of the inquiry into the validity of a time, place, and manner regulation. It is enough that the color restriction substantially serves the Government's legitimate ends.[12]

---

[12] JUSTICE BRENNAN argues that the color restriction at issue in this case is invalid because one of the interests served by that restriction—prohibiting counterfeiters from gaining access to color negatives and plates and from having an instant alibi for possessing those items—was not adequately expressed in the 1958 legislative history. *Post*, at 688–690, n. 27. Although Congress never expressly articulated this specific interest when it enacted the legislation in 1958, it did state that in imposing the size and color restrictions, it was relying heavily on the Treasury Department's opinion that the restrictions would adequately ensure that the statutory exception would not "facilitate counterfeiting." S. Rep. No. 2446, at 5–6;

The propriety of the size limitation is even clearer. The size limitation is a reasonable and sufficiently precise way of ensuring that the illustrations themselves do not have the capacity to deceive the unwary and inattentive. Indeed, Time does not advance any serious challenge to the legitimacy of that requirement.

The color and size limitations are therefore reasonable manner regulations [13] that can constitutionally be imposed on

---

H. R. Rep. No. 1709, at 3. JUSTICE BRENNAN does not dispute that this interest is furthered by the color requirement's effect of limiting the availability of negatives and plates to would-be counterfeiters. Instead, he argues that the particular negatives and plates used by Time would be of little assistance to counterfeiters and that the asserted interest is adequately served by other provisions of the statute. Post, at 688–690, n. 27. Neither of these arguments is persuasive.

First, in determining whether a time, place, and manner regulation substantially serves the Government's interest, the effectiveness of the regulation should not be measured solely by the adverse consequences of exempting a particular plaintiff from the regulation. Clark v. Community for Creative Non-Violence, ante, at 296–297; Heffron v. International Society for Krishna Consciousness, Inc., 452 U. S. 640, 652–653 (1981). If Time is exempted from the color requirement, so must all others who wish to use such reproductions. While Time may consistently use negatives and plates that are of little use to counterfeiters, there is no way of ensuring that others will adhere to that practice.

Second, the fact that the Government's interest is served to some degree by the requirement that the negatives and plates be destroyed after their final use does not render the color requirement superfluous. During the time that the negatives and plates are in existence for legitimate purposes, they can still be used for counterfeiting purposes, possibly by the same individuals who are creating the legitimate reproductions. Coupled with the other interest served by the color requirement—to prevent the unwary from being deceived by otherwise legitimate reproductions—we believe that the Government's interest in the increased deterence provided by the color requirement in this respect is sufficient to override whatever interest Time might have in printing the reproduction in color.

[13] Time does not suggest that the color and size restrictions are invalid because they fail to leave open ample alternative channels of communication. Nor would such an argument be persuasive. Time is free to use whatever means it wishes to communicate its ideas short of using color

those wishing to publish photographic reproductions of currency. Because the provisions of § 474 are of real concern only when the limitations of § 504 are not complied with, § 474 is also constitutional.

## III

The District Court correctly determined that the purpose requirement of § 504 is unconstitutional.[14] However, it erred in failing to consider the validity of the remaining portions of the statute that applied to Time. Because the color and size limitations are valid, neither § 474 nor § 504 is unconstitutional on its face or as applied to Time.[15] The judgment of the District Court is accordingly affirmed with respect to the purpose requirement and reversed with respect to the color and size limitations.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, concurring in part and dissenting in part.

Title 18 U. S. C. § 474, ¶ 6, makes it a federal crime to use pictures of money for any purpose whatsoever, even in the absence of an unlawful intent, and without regard to whether such pictures, or the materials used to make them, might be employed fraudulently. Recognizing that this flat ban sweeps within it a substantial amount of legitimate expression posing virtually no risk of counterfeiting, Congress enacted 18 U. S. C. § 504, which exempts from the ban illustrations of the currency "for philatelic, numismatic, educational, historical, or newsworthy purposes in articles, books, journals, newspapers, or albums," provided such illustrations meet certain restrictions as to form and preparation.

---

photographs that do not meet the size requirement. The alternative means of communication left open are almost limitless.

[14] All Justices except JUSTICE STEVENS agree that the District Court was correct to this extent.

[15] The Justices joining this opinion and JUSTICE STEVENS disagree with and reverse the District Court in these respects.

In my view, these two statutes as currently written work together to effect a significant abridgment of expression. And, given the extensive and detailed criminal regulation of counterfeiting found in other parts of Title 18, the two provisions only marginally serve the Government's concededly highly important interest in preserving the integrity of the currency. The Court today does not expressly reject either of these conclusions. Indeed, eight Justices recognize that Congress' obvious and exclusive intent—to permit only those illustrations of currency with "philatelic, numismatic, educational, historical, or newsworthy purposes" and to ban all others—simply cannot constitutionally be achieved through the legislatively chosen means. *Ante,* at 648–649. Nevertheless, JUSTICE WHITE, joined in the judgment on this point by JUSTICE STEVENS, concludes that "neither § 474 nor § 504 is unconstitutional on its face or as applied to Time." *Ante,* at 659.

The key to this paradoxical result lies in the fact that somewhere between the beginning and the end of his opinion, JUSTICE WHITE stops reviewing the statutes enacted by Congress and begins assessing a statutory scheme of his own creation. After identifying separate "purposes" and "publications" conditions for obtaining the § 504 exemption and, correctly in my view, invalidating the former, JUSTICE WHITE proceeds as though the two requirements were written in the disjunctive. He assumes that Congress would have wanted to exempt illustrations satisfying *either* condition and therefore feels authorized to leave one in force while invalidating the other. Accordingly, JUSTICE WHITE proposes simply to excise certain offending words from the integrated clause in which they appear and leaves the rest of the statutory language in place—confident that the revised version of the statute "sufficiently accommodates Time's First Amendment interests," *ante,* at 648, while effectuating "the policies Congress sought to advance," *ante,* at 653.

I certainly agree with the principle that we should construe statutes to avoid constitutional questions, so long as our interpretation remains consistent with Congress' objectives. But, in my view, JUSTICE WHITE's limiting construction of the statutory scheme at issue here neither remains faithful to congressional intent nor rids the legislation of constitutional difficulties. The statutory scheme left in force after JUSTICE WHITE's "remarkable feat of judicial surgery," *Welsh* v. *United States*, 398 U. S. 333, 351 (1970) (Harlan, J., concurring in result), would ban illustrations of currency by all "nonpublishers," even for the kinds of purposes Congress plainly intended to allow, but permit identical illustrations by all "publishers," without regard to the purposes of their illustrations and even if the nature of their media poses a relatively greater risk of counterfeiting. Such a reconstructed scheme bears no relationship to the language, history, or purpose of the statutes as enacted. And, despite the removal of the "purposes" requirement, the revised statutes remain unconstitutional on their face.

I

Because the Court decides that §§ 474 and 504 are constitutional as applied to Time, it may be useful to review in somewhat more detail precisely how these provisions have been applied to appellee. For many years, Time's various magazines have used pictures of United States currency to illustrate articles concerning political, economic, and sports events. As appellee explains, these pictures have depicted bills "significantly enlarged or reduced in size, discolored or otherwise altered in appearance, shown only in part, and/or substantially obscured by printed legends or overlaid objects." Brief for Appellee 3. In addition, each picture "appeared on only one side of a page," and that page was of the glossy paper used in the production of appellee's magazines. *Ibid.* See 539 F. Supp. 1371, 1377–1379 (SDNY 1982).

662

Beginning as early as 1965, Time was warned by agents of the Secret Service that such illustrations violated the ban on currency reproductions imposed by § 474 and were not exempt under § 504. App. 29. In the ensuing years, Secret Service agents offered Time several different interpretations of the statutory requirements. At various points, Time was informed (a) that it could print only black and white likenesses of currency of a specified size and only for "numismatic, educational, historical or newsworthy" purposes, *id.*, at 27; (b) that it could never print any photograph of currency in any color or size, because § 504(1) exempts only "illustrations," *ibid.;* and (c) that it could only print likenesses accompanied by "numismatic, educational, historical or newsworthy" information *about* the particular Federal Reserve Note illustrated, *id.*, at 27–28, and could not use likenesses for "decorative or eye-catching purposes," *id.*, at 33.

Relying on these varying constructions of the statutes, Secret Service agents informed Time that it violated federal law when it used partial and distorted likenesses of currency to illustrate articles concerning, among other things, inflation, the effect of economics on an election campaign, a conference on international monetary policy, corporate bribery, and the financial difficulties faced by a "cash-rich" corporation. *Id.*, at 29–34. On several occasions, advance warnings and "slap[s] on the wrist," *id.*, at 34, from the Secret Service led Time's editors to withdraw covers that had been prepared and to substitute illustrations which, in their judgment, were "not nearly as effective in communicating the thought intended to be conveyed as the illustration banned by the Secret Service." *Id.*, at 30.

In May 1981, a Secret Service agent informed Time's legal department that the cover of an issue of Sports Illustrated that had appeared three months earlier violated the counterfeiting statute. The supposedly offending cover, illustrating an article concerning a bribery scandal in amateur basketball, included color reproductions of portions of $100 bills, one-third of actual size, pouring into a basketball hoop. The

agent told Time that the Secret Service would seize all materials used in preparation of the cover, asked for the names and addresses of all individuals or companies involved in its production, and requested an interview with a member of Time's management.  Ten days later, Time brought this action seeking declaratory and injunctive relief to prevent the Government's enforcement or threat of enforcement of §§ 474 and 504 against Time.

## II

The linchpin of JUSTICE WHITE's opinion is his view that the words in § 504(1) limiting the exemption to illustrations of currency "for philatelic, numismatic, educational, historical, or newsworthy purposes," can be excised from the phrase in which they appear while leaving in force the language that remains, notably the requirement that exempted illustrations appear in certain "publications," that is, "in articles, books, journals, newspapers, or albums."  See *ante*, at 649, 652. JUSTICE WHITE acknowledges that, after invalidating the "purposes" requirement, he should decide whether what is left consists of " 'unobjectionable provisions separable from those found to be unconstitutional.' "  *Ante*, at 652 (quoting *El Paso & Northeastern R. Co.* v. *Gutierrez*, 215 U. S. 87, 96 (1909)).  But, although he explains why he finds the "publications" requirement "unobjectionable," at least in the context of this case, *ante*, at 650–652, he never explains why the language setting out that condition is "separable" from the rest of the sentence in which it appears.[1]

---

[1] In response to this opinion, JUSTICE WHITE denies that he has severed the "publications" requirement from the "purposes" requirement or that he needs to do so in order to reach his result.  *Ante*, at 649–650, n. 6, 652, n. 9. But a court must obviously determine the scope of a statutory standard under review before evaluating its constitutionality.  From the outset of this litigation, both parties and the District Court have read § 504 as establishing a single, unified exemption from the ban against currency illustrations and have assumed, correctly in my view, that each requirement in the statute is a necessary condition for obtaining that exemption.  After

In my view, the language of the statute JUSTICE WHITE would leave in force is neither "separable" nor "unobjectionable." Despite his recognition that severability depends "largely" on congressional intent, *ante*, at 653,[2] his deletion of

correctly striking down the "purposes" requirement, *ante*, at 649, JUSTICE WHITE states that the "publications" requirement "standing alone" may not be challenged here, *ante*, at 649–650. Necessarily, therefore, JUSTICE WHITE believes that the "publications" requirement *can* "stand alone" without the "purposes" requirement.

Because of his construction of the "purposes" language, JUSTICE STEVENS does not reach the question whether the rest of the statute can remain in force without that requirement, consistent with congressional intent. On that issue, the Court is equally divided. Compare *ante*, at 652–656 (opinion of WHITE, J.), with *post*, at 691–692 (POWELL, J., concurring in part and dissenting in part).

I join Part II–A of JUSTICE WHITE's opinion because I find JUSTICE STEVENS' interpretation of the "purposes" requirement impossible to square with either the plain language of the statute or its legislative history. For instance, if, as JUSTICE STEVENS suggests, *post*, at 698–699, § 504 is meant to exempt any illustration in which money is not used for counterfeiting purposes, it is difficult to see why Congress prohibited the use of currency for advertising purposes. And, as I detail below, the history of the statute demonstrates that it was initially enacted, and later amended, in order to exempt from the ban on likenesses of the currency only those illustrations that serve the specific purposes Congress listed. See *infra*, at 668–673. JUSTICE STEVENS, largely ignoring the text of the statute and its history, seems to treat the "purposes" language as though it adds nothing to the "publications" requirement. I believe he thereby carries the principle of construing statutes in order to save them from constitutional attack " 'to the point of perverting the purpose of [the] statute . . .' [and] judicially rewriting it." *Aptheker* v. *Secretary of State*, 378 U. S. 500, 515 (1964) (quoting *Scales* v. *United States*, 367 U. S. 203, 211 (1961)). Moreover, he leaves the precise meaning of the statutory words he interprets far from clear. Thus, his "attempt to 'construe' the statute and to probe its recesses for some core of constitutionality . . . inject[s] an element of vagueness into the statute's scope and application. . . ." *Aptheker*, *supra*, at 516.

[2] In fact, contrary to JUSTICE WHITE's implication, severability is exclusively a question of legislative intent. See, *e. g.*, *New York* v. *Ferber*, 458 U. S. 747, 769, n. 24 (1982). And, like the general rule of construing

a few words from an indivisible phrase in § 504 would work a dramatic change in the scope of the scheme contemplated by Congress. As a result of this exercise in legislative draftsmanship, all members of the ill-defined class of "publishers" meeting the other requirements of § 504 would be exempt from the § 474 ban, regardless of the purposes their illustrations may serve or the risk their illustrations may pose of endangering the currency. Conversely, all "nonpublishers" would be subject to the § 474 ban, even when pursuing the same legitimate purposes through illustrations that pose a similar, or even smaller, threat of counterfeiting. I do not believe this limiting construction of the statutory scheme can be supported by (A) the language and structure of § 504 or (B) its legislative history and purposes. And, as I shall show in Part III, the substantial abridgment of free expression imposed by these statutes, even as JUSTICE WHITE would revise them, renders the remaining language far from constitutionally "unobjectionable."

## A

As relevant here, the version of § 504 passed by Congress exempts from the criminal prohibition against using pictures of the currency

---

statutes to avoid constitutional questions from which it derives, *ibid.*, the doctrine of severability "does not . . . license a court to usurp the policymaking and legislative functions of duly elected representatives." Cf. *Heckler* v. *Mathews*, 465 U. S. 728, 741 (1984). Instead, courts addressing questions of severability should be guided by Chief Justice Taft's admonition "that amendment may not be substituted for construction, and that a court may not exercise legislative functions to save [a] law from conflict with constitutional limitation." *Yu Cong Eng* v. *Trinidad*, 271 U. S. 500, 518 (1926). See *Califano* v. *Westcott*, 443 U. S. 76, 89–91 (1979); *id.*, at 94–96 (POWELL, J., concurring in part and dissenting in part); *NLRB* v. *Catholic Bishop of Chicago*, 440 U. S. 490, 508–511 (1979) (BRENNAN, J., dissenting); *Welsh* v. *United States*, 398 U. S. 333, 354 (1970) (Harlan, J., concurring in result); *Aptheker* v. *Secretary of State, supra*, at 515; *Moore Ice Cream Co.* v. *Rose*, 289 U. S. 373, 379 (1933).

"(1) the printing, publishing, or importation, or the making or importation of the necessary plates for such printing or publishing, of illustrations of—

. . . . .

"(C) any . . . obligation or other security of the United States, . . .

. . . . .

*"for philatelic, numismatic, educational, historical, or newsworthy purposes in articles, books, journals, newspapers, or albums* (but not for advertising purposes, except illustrations of stamps and paper money in philatelic or numismatic advertising of legitimate numismatists and dealers in stamps or publishers of or dealers in philatelic or numismatic articles, books, journals, newspapers, or albums)." 18 U. S. C. § 504(1) (emphasis added).

The plain language of § 504(1) extends the availability of the exemption from the § 474 ban to those illustrations serving the specified enumerated purposes and to no others. Although the statute also requires such illustrations to appear in certain media, the "purposes" and "publications" restrictions are not written in the disjunctive. They are instead linked by the word "in," indicating that neither is a sufficient condition for claiming the protection of the statute; the only illustrations that are permitted are those that both serve the specified purposes *and* appear "in articles, books, journals, newspapers, or albums." By its terms, therefore, the list of media is a qualification that narrows the scope of the exemption, rather than an independent and severable basis for obtaining permission to use illustrations of the currency.[3]

---

[3] Congressional Committees reporting recent amendments to § 504 have also described each of its requirements as necessary conditions for obtaining the protection of the exemption. See, *e. g.,* H. R. Rep. No. 1213, 90th Cong., 2d Sess., 1–2 (1968) (permitted illustrations must "meet the following three conditions" including "purposes" and "publications" restrictions); *id.,* at 4 (must "comply with all of the following conditions"); *id.,* at 6 ("must be for philatelic, educational, historical, or newsworthy purposes,

JUSTICE WHITE initially recognizes that the "purposes" and "publications" restrictions act together to limit the scope of the exemption. See *ante*, at 645–646. Yet, in concluding that Congress would exempt even those "publications" that do not serve the designated "purposes," see *ante*, at 649, JUSTICE WHITE proceeds as though the two requirements were written in the disjunctive. Only by reading the statute as permitting illustrations that meet *either* the "purpose" *or* the "publication" requirement can one conclude that Congress would have wanted the exemption to be available to parties satisfying one condition but not the other.

As far as I am aware, this is the first time that Members of the Court have sought to sever selected words from a single integrated statutory phrase and to transform a modifying clause into a provision that can operate independently.[4] To be sure, Congress could easily have placed the "purpose" and "publication" requirements in separate subsections and connected them with the word "or"; in that event, one might plausibly conclude that one can operate as a basis for exemption without the other.[5] The fact is, however, that Congress

must appear in certain publications, and must not be used for advertising purposes").

[4] Cf. *Planned Parenthood of Missouri* v. *Danforth*, 428 U. S. 52, 83 (1976) (two sentences in one section of statute "must stand or fall as a unit" since they "are inextricably bound together"). See *Philbrook* v. *Glodgett* 421 U. S. 707, 713 (1975) (" 'In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy' "); *Kokoszka* v. *Belford*, 417 U. S. 642, 650 (1974) ("When 'interpreting a statute, the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute . . . and the objects and policy of the law, as indicated by its various provisions, and give to it such a construction as will carry into execution the will of the Legislature' "); *Richards* v. *United States*, 369 U. S. 1, 11 (1962) ("a section of a statute should not be read in isolation from the context of the whole Act").

[5] Cf. *EEOC* v. *Allstate Insurance Co.*, 570 F. Supp. 1224 (SD Miss. 1983) (concerning severability of separately denominated legislative veto provision from remainder of statute), appeal dism'd, 467 U. S. 1232 (1984).

did not enact the statute in that form, and there is no indication that it intended the statute to operate as though it had. By using the qualifying connective "in"—rather than "*or* in"—Congress must have intended an exemption only for those illustrations "in articles, books, journals, newspapers, or albums" that serve the listed purposes—and not for *any* picture that could be said to appear in the designated media. In short, the very language with which Congress joined the "purposes" and "publications" requirements refutes JUSTICE WHITE's conclusion that they are severable.[6]

## B

Notwithstanding the statute's clearly expressed goal of exempting *only* illustrations with "philatelic, numismatic, educational, historical, or newsworthy purposes," JUSTICE WHITE expresses his confidence that "the policies Congress

---

See *Carter* v. *Carter Coal Co.*, 298 U. S. 238, 335 (1936) (opinion of Cardozo, J.) ("confirmatory token [of severability] is the formal division of the statute into 'Parts' separately numbered"); *George Hyman Construction Co.* v. *Occupational Safety & Health Review Comm'n*, 582 F. 2d 834, 840, n. 10 (CA4 1978) ("[n]ormally, use of a disjunctive indicates alternatives and requires that they be treated separately unless such a construction renders the provision repugnant to the Act").

[6] There are several other indications in the language and structure of the statute that the "purposes" language imposes an inextricable limitation on the availability of the § 504(1) exemption and that the restrictions as to media were not intended to establish an independent and severable exemption for "publications." First, the *entire* phrase bisected by JUSTICE WHITE is followed by a parenthetical clause setting out a further elaboration of the types of purposes permitted. Thus, both the beginning and the end of the sentence in which the list of fora appears concern permitted *purposes*. Second, when prohibiting illustrations for advertising purposes, the statute exempts advertising related to stamp and coin collecting by using the phrase "in philatelic or numismatic articles, books, journals, newspapers, or albums"—confirming that the listed purposes act as inseparable limitations on the enumerated media. Third, § 504(2) expressly exempts movies and slides without regard to their purpose unless they are converted *into prints,* in which case the "purposes" requirements of § 504(1) apply. Deletion of the "purposes" language would render meaningless this express distinction between the two parts of the statute.

sought to advance by enacting § 504 can be effectuated" even though that standard is unenforceable. *Ante,* at 653. He never explains, however, how congressional policies might be advanced with the "purposes" language deleted and the "publications" requirement left in force. Indeed, he never indicates just what function he believes the list of publications in the statute was intended to serve. We cannot, however, properly conclude that the "publications" requirement can be left "standing alone," *ante,* at 649–650, without considering how that requirement relates to the overall objectives of the statutory scheme. A review of the history and purposes of the statutory scheme provides no support for the conclusion that Congress would want to extend special protection to all illustrations in "publications" and to ban the pictures of "nonpublishers," without regard to whether either group's illustrations serve "philatelic, numismatic, educational, historical, or newsworthy purposes."

### (1)

Consistent with the plain language of § 504, the statute's legislative history confirms that it was originally adopted, and later amended, in order to exempt from the otherwise comprehensive ban on likenesses of the currency only those illustrations that serve the specific purposes Congress deemed worthy of special protection. At the outset, it is crucial to recall the breadth of Congress' total ban on all illustrations of the currency, a prohibition that was hurriedly adopted as part of comprehensive emergency legislation designed to fund the Civil War, see *ante,* at 643–644, and n. 1, and that has been reenacted with little explanation and only minor changes in wording in every subsequent revision and codification of the Federal Criminal Code. See Brief for Appellee 6–8.

Beginning nearly 60 years after the broad prohibition was first enacted, Congress grew concerned that the prohibition swept within it a number of legitimate activities posing little threat of counterfeiting. Accordingly, in a succession of

670

enactments, Congress fashioned certain exceptions for specific activities it found worthy of special protection. It began with stamp collecting, an activity whose importance to those who drafted and amended § 504 is still evident in the structure of the current version. The crucial language in the present statute first came into the criminal code in 1923 with "[a]n Act to allow the printing and publishing of illustrations of foreign postage and revenue stamps from defaced plates." Ch. 218, 42 Stat. 1437. As its statement of purpose indicates, that statute was passed in recognition of the fact that "[t]here are a great many stamp collectors in this country, and [the statute's] purpose was to permit them to issue and gather together defaced stamps and print them for the benefit usually of children." 64 Cong. Rec. 4976 (1923) (remarks of Sen. Cummins). Although Congress achieved this aim by protecting certain kinds of publications, the language it employed makes it crystal clear that it intended to exempt only publications serving the specified purpose of stamp collecting. Thus, the statute allowed illustrations only "in *philatelic or historical* articles, books, journals, albums, or the circulars of legitimate publishers or dealers in [designated] stamps, books, journals, albums or circulars," ch. 218, 42 Stat. 1437 (emphasis added), plainly indicating that the listed publications could carry the permitted illustrations only if they were of a "philatelic or historical" nature. Accordingly, an exemption for activities with the specified purpose was the exclusive object of the legislation and was intended to qualify its scope.

In 1937, the statute was amended to extend its protection to undefaced foreign stamps and to allow the Treasury Department to regulate exempted uses, ch. 10, 52 Stat. 6. See S. Rep. No. 1159, 75th Cong., 1st Sess., 3 (1937). The new version, now entitled "an act [t]o permit the printing of black-and-white illustrations of United States and foreign postage stamps for philatelic purposes," ch. 10, 52 Stat. 6, carried forward the original restriction to publications concerned with

stamp collecting and slightly enlarged the group of publications so protected. In a stylistic clarification that highlights the centrality of the "purposes" requirement, the 1937 amendment also introduced the sentence structure that remains in the statute today: Whereas the 1923 statute exempted only illustrations in "philatelic or historical books, journals, albums or circulars," the 1938 revision permitted illustrations "for philatelic purposes *in* articles, books, journals, newspapers, or albums . . . ." *Ibid.* (emphasis added). This modification, which established the basic form of the current provision, extended the exemption to the five types of publications listed, *but only if they used the illustrations for "philatelic purposes."* Congress thereby indicated its unmistakable intention that the "purpose" requirement would continue to play the central role in the availability of the exemption.[7]

The exemption was amended again in 1958 in order to extend its protection to illustrations of United States obligations other than stamps and to expand the range of specified purposes for which such illustrations could be used. Pub. L. 85–921, 72 Stat. 1771. This revision retained the sentence structure of the 1938 statute, including its list of permissible media. And, as before, the legislative history makes clear that Congress intended the "purposes" restriction to continue to act as a central and indispensable qualification on the scope of the exemption. For instance, the Committee Reports say nothing about specially favored "publications" when they explain that the purpose of the bill, as relevant here, is to "[p]ermit black and white illustrations of United States and foreign paper money and other obligations and securities

---

[7] In 1948, as part of a general codification of the criminal laws, the exemption, with only "[m]inor changes in phraseology" not relevant here, H. R. Rep. No. 152, 79th Cong., 1st Sess., A40 (1945), was given its current section number and a shorter title, "PRINTING STAMPS FOR PHILATELIC PURPOSES." 62 Stat. 713.

*for educational, historical, and newsworthy purposes."* H. R. Rep. No. 1709, 85th Cong., 2d Sess., 1 (1958); S. Rep. No. 2446, 85th Cong., 2d Sess., 3 (1958) (emphasis added). See also H. R. Rep. No. 1709, at 7; S. Rep. No. 2446, at 8. Nor do the Reports indicate any special solicitude for "publications" when they state that the bill is meant to codify the Treasury Department's practice of permitting "exceptions to [§ 474] by granting special permission to use illustrations of United States bonds and paper money *for numismatic, historical, and educational purposes."* H. R. Rep. No. 1709, at 3; S. Rep. No. 2446, at 5 (emphasis added).[8] Indeed, the only illuminating reference in the Reports to the "publications" requirement,[9] indicates that it was intended simply to ensure that illustrations for the permitted purposes not take the form of *"facsimiles* in the likeness of paper money or other obligations," H. R. Rep. No. 1709, at 4; S. Rep. No. 2446, at 6 (emphasis added). In light of the fact that existing law already controlled the use and possession of facsim-

---

[8] The Committee Reports refer to regulations promulgated by the Treasury Department to enforce the existing exemption for illustrations with "philatelic purposes in articles, books, journals, newspapers, or albums." H. R. Rep. No. 1709, at 2; S. Rep. No. 2446, at 4. Not surprisingly, there is nothing in the cited regulations suggesting a special effort to prevent illustrations in "nonpublications," much less to define such a classification. See 31 CFR § 402.1 (1959) (granting permission "to make, hold and dispose of black and white reproductions of canceled United States internal revenue stamps: *Provided,* That such reproductions are made, held and disposed of as part of and in connection with the making, holding, and disposition, for lawful purposes, of the reproductions of the documents to which such stamps are attached"); § 405.1 (permitting illustrations of war bonds "for publicity purposes" without restriction as to forum).

[9] It is true, as JUSTICE WHITE notes, *ante,* at 651, and n. 6, that the examples given by the Committees of people who might wish to use illustrations of money for legitimate purposes—textbook and newspaper publishers, collectors of paper money, and historians—could all be said to involve "publications." There is no indication in the legislative history, however, that these examples were meant to be exclusive.

iles for *illegitimate* purposes,[10] that reference only strengthens the conclusion that the sole objective of § 504 was to permit illustrations for purposes Congress considered worthwhile.[11]

Given this history, it is clear that the central objective of § 504—its very essence—was to exempt *only* illustrations "for philatelic, numismatic, educational, historical, or newsworthy purposes." Having concluded that this objective cannot constitutionally be achieved through the legislatively chosen means, JUSTICE WHITE therefore errs in simply deleting the crucial statutory language and using the words that remain as the raw materials for a new statute of his own making.

---

[10] Independent of the provisions at issue here, several other parts of the extensive statutory scheme designed to prevent counterfeiting control the possession of items which, by virtue of their size, shape, or consistency, look like pieces of currency. For instance, § 474, ¶ 5, the provision immediately preceding the one invoked against appellee, imposes criminal liability on anyone who "has in his possession or custody . . . any obligation or other security made or executed, in whole or in part, after the similitude of any obligation or other security issued under the authority of the United States, with intent to sell or otherwise use the same . . . ." In *United States* v. *Turner,* 586 F. 2d 395, 397–399 (CA5 1978), the Court of Appeals sustained the conviction, under § 474, ¶ 5, of an individual who possessed a number of one-sided photocopies of dollar bills of a kind that had been used successfully to defraud change machines. See also § 474, ¶ 4; *United States* v. *Dixon,* 588 F. 2d 90, 91–92 (CA4 1978); *Koran* v. *United States,* 408 F. 2d 1321 (CA5 1969); *Webb* v. *United States,* 216 F. 2d 151 (CA6 1954).

[11] In 1968, the exemption was amended so as to permit colored illustrations of stamps. Pub. L. 90–353, 82 Stat. 240. Although the Committee Reports explaining this amendment referred to the "publications" requirement, they continued to describe satisfaction of the "purposes" requirement as a necessary condition for obtaining the statutory exemption. See H. R. Rep. No. 1213, 90th Cong., 2d Sess., 1–2, 4, 5, 6 (1968); S. Rep. No. 1206, 90th Cong., 2d Sess., 1–2, 4, 5, 7 (1968). See n. 2, *supra.*

The statute was amended again in 1970 in order to include postage meter stamps within its protections. Pub. L. 91–448, 84 Stat. 921. See H. R. Rep. No. 91–640, p. 1 (1969).

(2)

In light of the history and obvious objective of the statute, an independent "publications" requirement standing alone makes little sense.  As appellants now seem to acknowledge,[12] the most plausible explanation for the requirement that illustrations serving the listed purposes appear "in articles, books, journals, newspapers, or albums" is that Congress thereby intended to provide further elaboration as to the general sorts of activities it wished to allow while seeking to ensure that the exemption not be used to justify the creation of likenesses so physically similar to genuine currency that they could be used fraudulently.  Appellants therefore suggest that the "purpose" and "forum" language work *together* to establish a single standard for exemption that is "descriptive and illustrative, rather than prescriptive and mandatory."  Brief for Appellants 28.  They thus read the entire phrase that JUSTICE WHITE would split in two as limiting the exemption's availability to legitimate "publications," broadly understood, as distinguished from potentially deceptive "facsimiles."

---

[12] The Government's construction of the statutory scheme it enforces has hardly been a model of consistency.  As noted above, the Secret Service has adopted at least three different interpretations of the exemption during the years it has overseen the work of Time's editors and art directors. See *supra*, at 662.  And even over the course of this litigation, appellants have frequently shifted their position.  In the District Court, they seemed to depart from a construction of § 504 published in a Department of Treasury pamphlet but left its precise reading of the statute extremely unclear. See Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment 26, n.  In their jurisdictional statement in this Court, appellants appeared to disavow the Treasury Department's published construction of the exemption.  Juris. Statement 15, n. 9.  And, finally, sometime between the filing of the jurisdictional statement and briefing on the merits, the Treasury Department itself abandoned its most recent interpretation of § 504 and amended its pamphlet, which now apparently conforms to the position the Government has taken in this Court.  See Brief for Appellants 28, n. 18.

This interpretation ascribes far more rationality to Congress than would any suggestion that, in order to obtain the benefit of the exemption, an illustration must literally "appear in one of the enumerated publications," cf., *ante*, at 651, n. 8. It is difficult to imagine why Congress would have considered only pictures "in articles, books, journals, newspapers, or albums"—as distinct from those on, say, leaflets or posters—sufficiently important or legitimate to warrant a special exemption from the § 474 ban.[13] Nor could the apparent arbitrariness of a special exemption for just the listed "publications" be justified by reference to Congress' desire to minimize the risk of counterfeiting. Although a limitation to the expressly listed media might exclude "facsimiles," there are numerous other media for expression not found in the statutory list that do not come close to resembling slips of paper in the shape and consistency of Federal Reserve Notes. It could hardly be contended, for example, that depictions of the currency on billboards, placards, or barnyard doors pose a greater threat of counterfeiting than identical illustrations in "articles, books, journals, newspapers, or albums." And, finally, although a restrictive reading of the "publications" requirement might arguably serve Congress' undoubted wish "to relieve the Treasury Department of the burden of processing numerous requests for special permission to use photographic reproductions of currency," *ante*, at 653, mere "administrative convenience," independent of any substantive objective, was plainly not the primary legislative goal. To the contrary, the legislative history of § 504 confirms that Congress' substantive objective in enacting a

---

[13] If § 504 permitted illustrations only in the enumerated publications on the theory that—without regard to their potential use in counterfeiting relative to unlisted media—the specified media are the only places in which "legitimate" illustrations will appear, it would, of course, rest on a distinction among otherwise identical communications according to an utterly undefined and unjustified Government selection of preferred speakers. Cf. *Police Department of Chicago* v. *Mosley*, 408 U. S. 92 (1972).

specific exemption from the § 474 ban was to grant special permission for illustrations serving specified purposes, and not to permit illustrations in certain publications simply because such an exemption would be easy to administer.[14]

---

[14] The same flaw undermines JUSTICE WHITE's conclusion that the color and size requirements of § 504 could stay in force consistent with congressional intent even if, contrary to his conclusion, *ante*, at 651–652, the "publications" requirement is unconstitutionally overbroad. See *ante*, at 652–653. In support of this hypothesis, JUSTICE WHITE states that "[t]here is no indication that Congress believed that the purpose requirement either significantly eased the Treasury Department's burden or was necessary to prevent the exception from being used as a means of circumventing the counterfeiting laws." *Ante*, at 654–655. But this argument only·defeats a straw man. The "purposes" requirement was obviously not meant to make the exemption easier to administer or to prevent its abuse. It was, instead, the substantive reason for enacting the exemption in the first place. If the only function of § 504 was to "ease the administrative burden without undermining the Government's efforts to prevent counterfeiting," *ante*, at 654, no list of permissible purposes would have been necessary or even desirable. Congress could have written a statute far easier to administer by simply exempting all illustrations satisfying the color and size requirements—in effect, substantially repealing the § 474, ¶ 6, ban. The fact that it did not do so demonstrates that its intention was far more limited than to exempt any illustration that is administratively convenient to identify. Contrary to the premise of JUSTICE WHITE's severability discussion, the language, legislative history, purpose, and administrative construction of § 504 from its beginnings in the 1920's to amendments in 1969 demonstrate unequivocally that the whole point of this exemption from the longstanding flat ban was to permit illustrations with the specified purposes and no others.

There is also a rather significant linguistic obstacle to JUSTICE WHITE's view. The statute imposes the color and size restrictions on "[i]llustrations permitted by the foregoing provisions of this section." With both the "purposes" and the "publications" requirements deleted, the "foregoing provisions" permit, as relevant here, "the printing . . . of . . . any . . . obligation or other security of the United States"—that is, *they permit everything prohibited by § 474, ¶ 6*. The sentence limiting the exemption to illustrations "for philatelic, numismatic, educational, historical, or newsworthy purposes in articles, books, journals, newspapers, or albums" is therefore clearly the heart of the exemption, and the remaining provisions are meant only to ensure that the central objective of permitting certain specified

Accordingly, I agree with appellants that the list of publications cannot sensibly reflect a congressional intention to confer special status on the particular media listed. Instead, those words are best read as operating in necessary conjunction with the "purposes" requirement to provide enforcement authorities with general guidance as to the particular kinds of "legitimate" activities Congress meant to protect while permitting those authorities to exclude uses in media whose form or appearance present too serious a risk of fraud. On this construction, however, the two requirements are so completely intertwined as to be plainly inseverable; they constitute a single statutory provision which operates as an integrated whole. They therefore "must stand or fall as a unit." Cf. *Planned Parenthood of Missouri* v. *Danforth*, 428 U. S. 52, 83 (1976).

## III

A court's obligation to leave separable parts of a statute in force is consistent with its general duty to give statutes constructions that avoid constitutional difficulties. See *New York* v. *Ferber*, 458 U. S. 747, 769, n. 24 (1982). Accordingly, in order to uphold a portion of an unconstitutional statute, a court must determine not only whether the legislature would have wanted that part to remain in effect, but also whether "what is left" is itself constitutional. See *Buckley* v. *Valeo*, 424 U. S. 1, 108–109 (1976). For the reasons I have set out in Part II, I cannot agree that Congress would have retained § 504 as presently written without the "purposes" requirement. Even if I am wrong, however, and JUSTICE WHITE's limiting construction of the statutory scheme is faithful to congressional intent, I would still reject that interpretation. In my view, the statutory scheme, even

---

legitimate activities is achieved without increasing the risk of counterfeiting. Without that central objective, those administrative safeguards ·cannot meaningfully be wrenched from the section and turned into ends in and of themselves.

without the "purposes" requirement, remains unconstitutional on its face.

Because the First Amendment interests at stake in this case are denigrated by the Government, Brief for Appellants 20, and all but ignored by JUSTICE WHITE, it becomes necessary to emphasize their nature and importance. The adage that "one picture is worth a thousand words" reflects the common-sense understanding that illustrations are an extremely important form of expression for which there is no genuine substitute.[15] And, as a cursory examination of the magazine covers at issue in this case vividly demonstrates, the image of money in particular is an especially evocative and powerful way of communicating ideas about matters of public concern, ranging from economics to politics to sports. See 539 F. Supp., at 1383. Contrary to appellants' contention, Brief for Appellants 20, a statute that substantially abridges a uniquely valuable form of expression of this kind cannot be defended on the ground that, in appellants' judgment, the speaker can express the same ideas in some other way.[16]

---

[15] Cf. *Spence* v. *Washington*, 418 U. S. 405, 410 (1974) *(per curiam)*; *Tinker* v. *Des Moines School District*, 393 U. S. 503, 505–514 (1969); *Stromberg* v. *California*, 283 U. S. 359, 369 (1931). In describing the expressive value of symbols like that at issue here, it is difficult, as is so often the case, to improve upon Justice Jackson's eloquence:

"Symbolism is a primitive but effective way of communicating ideas. The use of an emblem or flag to symbolize some system, idea, institution, or personality, is a short cut from mind to mind. Causes and nations, political parties, lodges and ecclesiastical groups seek to knit the loyalty of their following to a flag or banner, a color or design. The State announces rank, function, and authority through crowns and maces, uniforms and black robes; the church speaks through the Cross, the Crucifix, the altar and shrine, and clerical raiment. Symbols of State often convey political ideas just as religious symbols come to convey theological ones. . . . A person gets from a symbol the meaning he puts into it, and what is one man's comfort and inspiration is another's jest and scorn." *West Virginia Board of Education* v. *Barnette*, 319 U. S. 624, 632–633 (1943).

[16] *E. g.*, *City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 812 (1984); *United States* v. *Grace*, 461 U. S. 171, 180–184

Even as JUSTICE WHITE would revise it, the statutory scheme at issue here works just such a substantial abridgment of speech for significant numbers of individuals who might wish to use illustrations of the currency for perfectly legitimate reasons and in ways that pose no serious risk of counterfeiting. Depending on which of two interpretations of the "publications" requirement is adopted, such illustrations are either (A) allowed, if at all, only when licensed by Secret Service agents enforcing an utterly standardless statutory definition of "illustrative" uses or (B) completely prohibited because they do not literally appear "in articles, books, journals, newspapers, or albums." Cf. *Secretary of State of Maryland* v. *Joseph H. Munson Co.*, 467 U. S. 947, 963, n. 11 (1984).

A

An independent "publications" requirement has not, until today, been understood as the critical element in the statutory scheme even by the Government. See *supra*, at 674–677.[17] We therefore have little basis on which to determine

---

(1983); *Metromedia, Inc.* v. *San Diego*, 453 U. S. 490, 501–502, 516 (1981) (plurality opinion); *Schad* v. *Mount Ephraim*, 452 U. S. 61, 78 (1981) (BLACKMUN, J., concurring); *id.*, at 79 (POWELL, J., concurring); *Linmark Associates, Inc.* v. *Willingboro*, 431 U. S. 85, 93 (1977); *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U. S. 546, 556–558 (1975); *Spence* v. *Washington, supra*, at 411, n. 4; *Schneider* v. *State*, 308 U. S. 147, 163 (1939).

Aside from the fact that the Government simply has no business second-guessing editorial judgments as to the communicative value of illustrations, cf. *Miami Herald Publishing Co.* v. *Tornillo*, 418 U. S. 241 (1974), appellants have made no effort to contest the sworn affidavits of appellee's editors and art directors that illustrations of the currency constitute a unique and irreplaceable means of communicating many ideas at the heart of First Amendment protections. See, *e. g.*, App. 75, 84, 89–90, 96–97, 102–103.

[17] Indeed, appellants claim that neither the "purpose" nor the "publications" requirements of § 504 "have ever served as a basis for enforcement of the statute." Juris. Statement 13. (With respect to the "purposes" requirement, the appellants' contention is contradicted by Time's undisputed affidavits, App. 27–28, and the findings of the District Court, 539 F. Supp., at 1377–1379).

precisely what kinds of illustrations it permits and what kinds it prohibits. Yet JUSTICE WHITE refuses to consider the scope of the statutory language he would sustain because of his confidence that those words will in no event pose problems for appellee. *Ante*, at 649.[18] But, given appellee's overbreadth challenge, we cannot avoid engaging in an assessment of the statute's reach and, therefore, of its possible vagueness. As the Court reaffirmed just last Term, "we have traditionally viewed vagueness and overbreadth as logically related and similar doctrines." *Kolender* v. *Lawson*, 461 U. S. 352, 358–359, n. 8 (1983). See also *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U. S. 489, 494, 495, 498–499 (1982). It is difficult to understand how JUSTICE WHITE, having rejected the Government's interpretation of the statute, can so easily "assume that the legitimate reach of § 504 'dwarfs its arguably impermissible applications' to nonpublishers," *ante*, at 651–652, without providing some explanation as to just what a "nonpublisher" may be. In order to evaluate Time's claim that "the statute is unconstitu-

---

[18] JUSTICE WHITE's rejection of Time's vagueness challenge, like his statement that "we may assume that the legitimate reach of § 504 'dwarfs its arguably impermissible applications' to nonpublishers," *ante*, at 651–652, neglects the fact that the "publications" requirement—which the Government disclaims ever using—has only become central to the statutory scheme by virtue of his severability conclusion. As a result, we have no way of gauging the meaning of that provision either with respect to its "arguably impermissible applications" or as it may be applied to Time, Inc.'s various activities, which undoubtedly include the use of illustrations of its covers in billboards, posters, or other "nonpublications." JUSTICE WHITE's conclusions on these points rest on assumptions of fact as to issues that, until now, appellee has had no reason to address because neither the parties nor the District Court anticipated the surprising suggestion that we excise the first part of the sentence in which the "publications" requirement appears and leave the rest standing. At a minimum, therefore, the case should be remanded to give appellee an opportunity to demonstrate how the newly independent "publications" requirement might apply to itself or others. Cf. *Kolender* v. *Lawson*, 461 U. S. 352, 369–371 (1983) (WHITE, J., dissenting).

tional in a substantial portion of the cases to which it applies," *ante,* at 650, we must consider how it applies to other cases— even if its application to appellee may be clear.[19]

As I have noted, *supra,* at 672–673, appellants' interpretation of the statute licenses the Treasury Department to determine, on a necessarily ad hoc basis, whether a given picture appears in a medium of which the statutory list is "illustrative" or whether, instead, its medium looks too much like the kind of "facsimiles" prohibited by other parts of the statutory scheme. This construction might enable many people using pictures of the currency for legitimate purposes to avoid criminal liability, but it creates precisely the sorts of constitutional infirmities that have led the Court to invalidate the "purposes" requirement. As read by appellants, the "publications" requirement vests in Secret Service agents, monitoring the enormous variety of uses to which pictures of the currency can be put, virtually unconstrained authority to decide whether a given illustration imposes criminal liability on its author or not. Cf. *Kolender* v. *Lawson, supra,* at 358–361.[20] Such unguided discretion inevitably poses a serious risk of government discrimination on the basis of content or subject matter. Cf. *Lovell* v. *Griffin,* 303 U. S. 444, 451–452 (1938). See *ante,* at 648–649 ("Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment"). See generally *Hynes* v. *Mayor of Oradell,*

_____

[19] See *Secretary of State of Maryland* v. *Joseph H. Munson Co.,* 467 U. S. 947, 954–959 (1984); *City Council of Los Angeles* v. *Taxpayers for Vincent, supra,* at 798–799; *New York* v. *Ferber,* 458 U. S., at 772–774; *Schaumburg* v. *Citizens for a Better Environment,* 444 U. S. 620, 634–639 (1980); *Broadrick* v. *Oklahoma,* 413 U. S. 601, 615–618 (1973).

[20] See *Wagner* v. *Simon,* 412 F. Supp. 426 (WD Mo.), aff'd, 534 F. 2d 833 (CA8 1976) (upholding confiscation by Secret Service agents of 3-foot long political protest poster depicting bill made to appear as a "$30 Inflationary Note" with picture of President Nixon at center); Washington Post, Nov. 17, 1983, p. B1 (reporting that Secret Service agents ordered municipal lottery board to stop using advertising posters that depict $1,000 bills).

425 U. S. 610 (1976). And because § 474, ¶ 6, unlike the other counterfeiting provisions in Title 18, imposes criminal liability without any showing of unlawful intent, construing § 504 to exempt only those uses deemed legitimate by enforcement authorities would render the statutory scheme "little more than 'a trap for those who act in good faith.'" *Colautti* v. *Franklin*, 439 U. S. 379, 395 (1979) (quoting *United States* v. *Ragen*, 314 U. S. 513, 524 (1942)).

Accordingly, if, as appellants suggest, the "publications" requirement is only "descriptive and illustrative" of the kinds of uses Congress intended to permit and its precise meaning must be left to case-by-case judgments by Secret Service agents, people "whose First Amendment rights are abridged by [§ 474, ¶ 6, will] have traded a direct prohibition on their activity for a licensing scheme that, if it is available to them at all, is available only at the unguided discretion of the [Secret Service]." Cf. *Secretary of State of Maryland* v. *Joseph H. Munson Co.*, 467 U. S., at 964, n. 12. On that interpretation, the statutory scheme upheld today is unconstitutional on its face "because it [is] apparent that any attempt to enforce such legislation would create an unacceptable risk of the suppression of ideas." *City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 797 (1984) (footnote omitted). See also *Kolender* v. *Lawson, supra,* at 358–359, n. 8.[21]

---

[21] See *Thornhill* v. *Alabama*, 310 U. S. 88, 97–98 (1940) ("It is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion. One who might have had a license for the asking may therefore call into question the whole scheme of licensing when he is prosecuted for failure to procure it"); *Lovell* v. *Griffin*, 303 U. S. 444, 451–452 (1938) ("We think that the ordinance is invalid on its face. Whatever the motive which induced its adoption, its character is such that it strikes at the very foundation of the freedom of the press by subjecting it to license and censorship"); *Stromberg* v. *California*, 283 U. S. 359, 369–370 (1931) ("A statute which upon its face, and as authoritatively construed, is so vague and indefinite as to permit the punishment of the fair use of [the] opportunity [for free politi-

## B

Insofar as his opinion reveals, however, JUSTICE WHITE appears to assume that the list of media is not "illustrative" as appellants suggest, but rather strictly limited to "articles, books, journals, newspapers, or albums." See *ante,* at 649, n. 5, 650, and nn. 6 and 7. Assuming, *arguendo,* that so construed the list of media is sufficiently definite to prevent arbitrary enforcement,[22] it presumably excludes illustrations of the currency—without regard to size, color, or capacity to deceive—on such items as placards, billboards, pamphlets, bumper stickers, leaflets, posters, artist's canvasses, and signs. Unlike JUSTICE WHITE, I have little trouble concluding that, by imposing criminal liability on persons making such illustrations without any showing of unlawful intent, the prohibition created by the "publications" requirement renders this penal scheme "'susceptible of sweeping and improper application.'" *Bigelow* v. *Virginia,* 421 U. S. 809, 816 (1975) (quoting *NAACP* v. *Button,* 371 U. S. 415, 433 (1963)). As appellee notes:

> "[E]qually banned by the statute are a Polaroid snapshot of a child proudly displaying his grandparent's birthday gift of a $20 bill; a green, six-foot enlargement of the portrait of George Washington on a $1 bill, used as theatrical scenery by a high school drama club; a copy of the legend, 'In God We Trust', on the leaflets distributed by those who oppose Federal aid to finance abortions; and a three-foot by five-foot placard bearing an artist's rendering of a 'shrinking' dollar bill, borne by a striking worker

cal discussion] is repugnant to the guaranty of liberty contained in the Fourteenth Amendment"). See generally *Colautti* v. *Franklin,* 439 U. S. 379 (1979).

[22] There is, however, much truth in the District Court's observation that "[t]he definition of a journal, newspaper or album is anyone's game to play." 539 F. Supp., at 1390. Cf. *Branzburg* v. *Hayes,* 408 U. S. 665, 703–705, and n. 40 (1972).

to epitomize his demand for higher wages in a period of inflation." Brief for Appellee 5–6.

I do not, of course, suggest that each of the people making and displaying these sorts of depictions will be deterred from doing so by potential enforcement of the broad statutory scheme upheld today. I have no doubt, however, that substantial numbers of them will be, particularly if advised by lawyers aware of today's decision. Cf. *Erznoznik* v. *City of Jacksonville*, 422 U. S. 205, 217 (1975).[23] To take a single example, a poster artist with a reasonably competent attorney would certainly think twice before risking his resources on the kind of political protest attempted by the defendant in *Wagner* v. *Simon*, 412 F. Supp. 426 (WD Mo.), aff'd, 534 F. 2d 833 (CA8 1976). See n. 20, *supra*. JUSTICE WHITE brushes this prospect aside with the statement that "one arguably unconstitutional *application* of the statute does not prove that it is substantially overbroad, particularly in light of the numerous instances in which the requirement will easily be met." *Ante*, at 651, n. 7 (emphasis added). But this remark misses the entire point of the overbreadth doctrine. Our willingness to entertain overbreadth challenges is based, not on concern with past applications of an unconstitutional statute to completed conduct, but rather on the recognition that "persons whose expression is constitutionally protected may well *refrain* from exercising their rights for fear of criminal sanctions provided by a statute susceptible of application

---

[23] See *Secretary of State of Maryland* v. *Joseph H. Munson Co.*, 467 U. S., at 967–968 ("Where, as here, a statute imposes a direct restriction on protected First Amendment activity, and where the defect in the statute is that the means chosen to accomplish the State's objectives are too imprecise, so that in all its applications the statute creates an unnecessary risk of chilling free speech, the statute is properly subject to facial attack" (footnote omitted)); *City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S., at 800, n. 19 ("where the statute unquestionably attaches sanctions to protected conduct, the likelihood that the statute will deter that conduct is ordinarily sufficiently great to justify an overbreadth attack").

to protected expression." *Gooding* v. *Wilson*, 405 U. S. 518, 521 (1972) (emphasis added).[24]

By imposing criminal liability without fault on those who use pictures of money for any purpose whatsoever unless the pictures appear in "publications," the statutory scheme at issue here plainly amounts to "a direct and substantial limitation on protected activity that cannot be sustained unless it serves a sufficiently strong, subordinating interest" of the Government. *Schaumburg* v. *Citizens for a Better Environment*, 444 U. S. 620, 636 (1980). The governmental interests putatively served by the scheme—the detection and prevention of counterfeiting—are, of course, substantial. But the many other criminal provisions aimed at counterfeiting,

---

[24] See also *Secretary of State of Maryland* v. *Joseph H. Munson Co.*, *supra*, at 964–968; *City Council of Los Angeles* v. *Taxpayers for Vincent*, *supra*, at 798–799; *Schaumburg* v. *Citizens for a Better Environment*, 444 U. S., at 634; *Erznoznik* v. *City of Jacksonville*, 422 U. S. 205, 216–217 (1975); *Bigelow* v. *Virginia*, 421 U. S. 809, 815–817 (1975); *Broadrick* v. *Oklahoma*, 413 U. S., at 612.

The passage in the text that I have quoted from Time's brief, *supra*, at 683–684, setting out examples of potential applications of the statutory scheme to protected conduct, belies JUSTICE WHITE's statement that the *Wagner* case is "the only concrete example brought to our attention by Time." *Ante*, at 651, n. 8. Furthermore, as the very portion of Time's brief cited by JUSTICE WHITE demonstrates, appellee did *not* in fact contend below that "it had standing to challenge the *publication* requirement because of the overbreadth doctrine." *Ante*, at 652, n. 8 (emphasis supplied). See Brief for Appellee 41, n. 29 ("One of Time's major assertions has been and remains that § 504 continues § 474, ¶6's proscription of considerably more expression than is necessary to prevent counterfeiting"). Instead, Time argued that § 504 as a whole—which until today's decision was understood by no one to have severable "purposes" and "publications" requirements—was overbroad. See 539 F. Supp., at 1377. The precise factual basis for Time's overbreadth argument is, in any event, beside the point. Given the argument, we are obliged to determine *as a matter of law* whether the statute is "'susceptible of sweeping and improper application.'" *Bigelow* v. *Virginia*, *supra*, at 816 (quoting *NAACP* v. *Button*, 371 U. S. 415, 433 (1963)). See generally *Secretary of State of Maryland* v. *Joseph H. Munson Co.*, *supra*.

together with the various exceptions to the § 474, ¶ 6, ban, demonstrate that those interests "are only peripherally promoted" by the provisions at issue here and "could be sufficiently served by measures less destructive of First Amendment interests." *Ibid.*

The strongest evidence that the important Government interest in preventing counterfeiting may be served by means less restrictive of free expression than those upheld today can be found in the numerous other provisions of Title 18 designed to serve that end.[25] Appellants contend that §§ 474, ¶ 6, and 504 add an essential additional weapon to this extensive enforcement arsenal. Although they have not been entirely consistent on the point, see n. 12, *supra,* appellants currently advance two ways in which these provisions enable

---

[25] Wholly apart from the statutes at issue here, it remains a crime to forge, counterfeit, or alter any United States obligation with intent to defraud, § 471; to pass, utter, publish, or sell (or attempt to do so), or to import, possess, or conceal a forged, counterfeited, or altered obligation with intent to defraud, § 472; to buy, sell, exchange, transfer, receive, or deliver any forged, counterfeited, or altered obligation with the intent that the same be passed, published, or used as true and genuine, § 473; to possess, with intent to forge or counterfeit, a plate, stone, or other thing (including photographic negatives) which resemble plates used to make currency, § 474, ¶ 4; to possess, take, sell, or make an impression from any tool, implement, instrument, or thing used for printing or making other tools or things used for printing obligations of the United States, §§ 475, 476; to place or connect together, with intent to defraud, different parts of two or more notes, bills, or other instruments issued by the United States so as to produce one instrument, § 484; and to make, use, or pass any "thing similar in size and shape" to United States currency in order to "procure anything of value" from any machine or other device designed to receive or be operated by lawful currency, § 491. See also § 474, ¶¶ 1, 2, 3, 5, 7 (other provisions regulating possession and use of materials employed in counterfeiting); § 492 (providing for forfeiture of "articles, devices, and other things made, possessed, or used in violation" of other provisions as well as of "any material or apparatus used or fitted or intended to be used" in counterfeiting "found in the possession of any person without authority from the Secretary of Treasury").

"the Secret Service to operate more effectively in tracing and identifying the source of counterfeit bills," Brief for Appellants 21. First, they contend that the ban on illustrations prevents the creation of "facsimiles" that, however innocent their purpose, could be passed off as genuine pieces of currency. See *id.*, at 34–35. It is, however, difficult to believe that the distorted and discolored pictures of portions of the currency that Time has placed on its covers have a serious capacity to deceive. Moreover, the "publications" requirement, if construed in a way to avoid potentially arbitrary enforcement, works to prohibit illustrations in numerous media—such as billboards, placards, posters, and walls—that are a far cry from "facsimiles" and that, indeed, bear less of a physical resemblance to actual money than pictures in "publications" might.

Second, appellants claim that, without §§ 474, ¶ 6, and 504, "counterfeiters would more readily be able to conceal their criminal conduct by associating with legitimate print shops, thereby availing themselves of an instant alibi for manufacturing and possessing currency negatives." *Id.*, at 21 (footnote omitted). But this argument is hard to take seriously, especially in light of the construction of the statutory scheme advanced by JUSTICE WHITE. For one thing, the plates and negatives manufactured by appellee for its covers are capable of producing only replicas of the distorted and discolored pictures of portions of currency for which they were made. See 539 F. Supp., at 1387; App. 76; n. 27, *infra.* And producing such plates hardly enhances the capacity or opportunity of those with access to legitimate printing facilities to produce other plates more useful in counterfeiting. Moreover, if the object of the ban is to minimize the counterfeiting possibilities created by the activities of legitimate printshops, that object is, to put it mildly, ill-served by a statute that prohibits only illustrations created by "nonpublishers." Finally, in an age of easy access to high-quality printing, ranging from

the office copying machine to the sophisticated photo-offset equipment of printers for hire, the notion that a would-be counterfeiter would use the plates created for appellee's magazine covers—instead of copying actual pieces of currency—strains credibility.

The degree to which a statutory ban on a form of expression substantially furthers legitimate state interests may often be assessed by consideration of its exceptions.[26] As originally enacted, and as JUSTICE WHITE would reinterpret it, the statutory scheme at issue here is riddled with arbitrary distinctions between lawful and unlawful activities that undermine appellants' claim that the scheme substantially furthers the Government's legitimate interests. Pictures appearing in the broad, but undefined, class of "nonpublications" are prohibited without regard to their manner of production, size, shape, color, composition, or capacity to deceive anyone. But pictures manfactured by "publishers," whose facilities would presumably be more useful to counterfeiters, see Brief for Appellants 21–22, as well as color slides of actual pieces of currency, § 504(2), are permitted. Likenesses appearing on newsprint or quality paper stock may be allowed, but apparently not those made of wood, plastic, or cardboard. A picture of a small portion of currency painted orange and appearing on a protest sign is prohibited, while a "publisher" may manufacture an enlarged negative which can be used to print the front of a dollar bill in its natural black and white.[27]

---

[26] See, e. g., Schaumburg v. Citizens for a Better Environment, 444 U. S., at 636; Metromedia, Inc. v. San Diego, 453 U. S., at 514 (plurality opinion); Schad v. Mount Ephraim, 452 U. S., at 72–77.

[27] Because I believe that the "purposes" and "publications" language in § 504(1) is inseparable from the statute's various conditions intended to ensure that exempted illustrations do not too closely resemble actual currency, see n. 14, supra, I need not consider whether the color and size limitations could constitutionally form part of a more carefully crafted statutory scheme and I therefore express no view on the constitutionality vel non of those requirements. The Court's decision to uphold the color

In sum, if the "publications" requirement has sufficiently definite content to prevent its arbitrary enforcement, the statutory scheme upheld today is fatally overbroad. The

restriction in the context of *this* statutory scheme, however, suffers from two serious flaws that should not pass without comment.

*First*, JUSTICE WHITE upholds the statute's apparently irrational distinction between black and white pictures and those appearing in, say, pink or orange on the basis of what may be the weakest conceivable kind of legislative history: A statement by a party to this litigation submitted to Congress three days after that party had filed its notice of appeal in this Court and concerning legislation that has not been reported out of committee, much less passed by either House of Congress. See App. D to Juris. Statement (transmitting to House Subcommittee statement of Deputy Assistant Secretary of Treasury on H. R. 4275). There is no indication whatsoever in the legislative history of the statute actually passed by Congress that color prints were excluded because they require more negatives to produce, thereby "increas[ing] a counterfeiter's access," *ante*, at 657, to materials that can be used illegitimately. Instead, it seems obvious that the color restriction was intended to minimize the possibility that permitted illustrations could be passed off as the genuine article. See, *e. g.*, 64 Cong. Rec. 4976 (1923) (remarks of Sen. Cummins) ("Mark you, these stamps are to be printed in black and white, not in color, and they are to be defaced, so that they can not possibly be used again").

*Second*, the *post hoc* justification offered by appellants for the color restriction in the statute as now written cannot satisfy the requirement that "viewpoint neutral" regulations abridging speech must be narrowly tailored to achieve substantial governmental interests. See, *e. g.*, *City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S., at 808; *Clark* v. *Community for Creative Non-Violence*, *ante*, at 293–294; *Brown* v. *Glines*, 444 U. S. 348, 354–355 (1980); *Procunier* v. *Martinez*, 416 U. S. 396, 413 (1974); *Erznoznik* v. *City of Jacksonville*, 422 U. S., at 217–218; *United States* v. *O'Brien*, 391 U. S. 367, 377 (1968); *id.*, at 388 (Harlan, J., concurring). Appellants have made no effort to controvert appellee's claim, based on uncontested affidavits accepted by the District Court, that "[w]hatever the practices of professional counterfeiters might be, all of Time's four color separations of currency contain every obscuring feature and distortion of the ultimate picture, and thus are useless to the counterfeiter." Brief for Appellee 44 (footnote omitted). See 539 F. Supp., at 1387, and n. 19. See generally H. Simon, Color in Reproduction 59–65 (1980). These distortions demonstrate that, contrary to JUSTICE STEVENS' assertion, *post*, at 700–701, Time *does* wish to use "illustrations

extensive and detailed provisions regulating counterfeiting in other parts of Title 18 as well as the numerous eccentric exceptions to the statutes at issue here demonstrate that the flat ban imposed by these penal provisions on a wide variety of expression posing no conceivable danger of counterfeiting is far "'greater than is necessary or essential to the protection of the particular governmental interest involved.'" *Seattle Times Co.* v. *Rhinehart,* 467 U. S. 20, 32 (1984) (quoting *Procunier* v. *Martinez,* 416 U. S. 396, 413 (1974)).

## IV

As appellants acknowledge, the statutory scheme sustained today "regulates the manner in which publishers

---

of the currency which plainly appear spurious." JUSTICE STEVENS' "patient" counterfeiter—trimming numerals, enlarging negatives, and airbrushing borderlines, *post,* at 701, n. 5—would obviously be far better off making photocopies of actual dollar bills than somehow trying to counterfeit money from the negatives used to produce the distorted pictures appearing in appellee's magazines. And, in light of the requirement in § 504(1)(iii) that "the negatives and plates used in making the [permitted] illustrations shall be destroyed after their final use in accordance with this section," it is difficult to see how the Government's interest in preventing access to multiple negatives is further advanced by the color requirement.

Perhaps most significantly, however, the Government does not prohibit color printing generally; therefore, allowing a printer to produce plates that can print only distorted pictures of portions of the currency cannot possibly provide him or his employees with an additional "alibi" for creating plates that can produce realistic facsimiles of currency. Nothing in the statutory scheme upheld today diminishes the ability of a printer with unlawful intentions to create such plates. See 127 Cong. Rec. 17624–17625 (1981) (remarks of Rep. McClory) (Section 504 "was enacted at a time when quality publishing was the domain of comparatively few highly skilled professionals. . . . Quality publishing is [today] by and large in color and no longer an elite technology. With its skills in such wide circulation, a restriction against color reproduction is a burden only on the legitimate, law-abiding printer"). Conversely, the legitimate and compelling Government interest at stake in this case—prevention of the manufacture of illustrations that might plausibly be used for counterfeiting—is fully served by the numerous provisions of Title 18 that make it a crime to make or pass materials that really look like currency. See nn. 10, 25, *supra.*

may depict an item every person sees every day." Brief for Appellants 33, n. 24. As enacted by Congress, this regulation took the form of prohibiting any such depictions unless they were "for philatelic, numismatic, educational, historical, or newsworthy purposes." In an admirable effort to sustain this scheme, JUSTICE STEVENS "construes" that language so that it means essentially nothing: Notwithstanding the "purposes" requirement he purports to uphold, any likeness of the currency is permissible unless it is used for counterfeiting. JUSTICE WHITE, in contrast, acknowledging that the "purposes" language cannot be "saved," offers a new statute that would limit the activities of publishers, whose technical capacity to engage in actual counterfeiting is thereby diminished not one whit, and that would completely ban illustrations by "nonpublishers," who presumably have no such capacity in the first place. The scheme Congress adopted is plainly unconstitutional; the alternative pieces of legislation proposed by JUSTICE WHITE and JUSTICE STEVENS bear little resemblance to the statutes Congress passed.

I do not doubt that a statute can be written that would both satisfy the requirements of the First Amendment and effectively advance the legitimate and important ends Congress sought to achieve in §§ 474, ¶ 6, and 504. Today's efforts to draft such a statute have, however, confirmed the wisdom of leaving that task to the Legislative Branch.

I would affirm the judgment of the District Court.

JUSTICE POWELL, with whom JUSTICE BLACKMUN joins, concurring in part and dissenting in part.

I agree with the reasoning and the holding of the Court that the "purposes" requirement contained in § 504 is unconstitutional. I do not agree with the Court's conclusion that "the policies Congress sought to advance by enacting § 504 can be effectuated even though the purpose requirement is unenforceable." Ante, at 653. As Part II–B(1) of JUSTICE BRENNAN's opinion explains, the plain language and legisla-

tive history of § 504 confirm that Congress enacted that provision for the sole purpose of exempting, from the otherwise comprehensive ban on likenesses of the currency, illustrations that serve specifically identified purposes. The "purposes" clause, therefore, is essential to the statutory plan. If that clause is unconstitutional, as the Court, in my view, properly holds, the entire statute is invalid. I agree with JUSTICE BRENNAN that JUSTICE WHITE "errs in simply deleting the crucial statutory language and using the words that remain as the raw materials for a new statute of his own making." *Ante*, at 673.

JUSTICE STEVENS, in his opinion concurring in the judgment in part, advances strong policy arguments in favor of upholding the color and size restrictions. See *post*, at 701–703, and n. 6. Under my view of the case, I do not reach this issue. I note further that one may assume that Congress—if necessary—would move promptly to enact a more carefully drawn statute.

In sum, I believe that the "purposes" clause of § 504(1) is unconstitutional, and that Congress would not have enacted the remaining provisions of § 504 without that clause. I, therefore, simply would invalidate § 504 and affirm the judgment of the District Court without reaching the constitutionality of either the "publication" requirement or the color and size restrictions.

JUSTICE STEVENS, concurring in the judgment in part and dissenting in part.

Time's challenge to the constitutionality of the prohibition against making any likenesses of currency might proceed on either of two quite different theories. First, even if Time's ability to communicate is adequately protected by the rather complex exception for publications that contain pictures complying with color and size limitations, the prohibition against communications that do not come within the exception is so broad—or so poorly defined—that the entire statute is invalid. Second, without considering the potential impact of

the statute on third parties, the restrictions are invalid, in whole or in part, as they apply to Time. Given that this statute contains an express exception for expression which may fully accommodate Time's First Amendment rights, I think the Court should begin its analysis by evaluating the impact of the statute on the litigant before the Court before it confronts any question concerning the statute's impact on third parties.

I also think that the Court should decline Time's invitation to plunge right into the constitutional analysis without pausing to determine whether, and to what extent, a fair construction of the statute would protect Time's legitimate interests and also avoid the unnecessary adjudication of constitutional questions. Most of the Treasury Department's criticism of Time's use of pictures of currency—and I believe all of its criticism of black and white reproductions—stemmed from what I regard as an incorrect reading of the word "newsworthy" in § 504(1). Although I recognize that the Government has not been consistent in its reading of that word, any ambiguity could readily have been eliminated by a declaratory judgment construing the term.

Time, however, did not ask the District Court or this Court for a favorable construction of the statute. Instead, as is the current fashion in First Amendment litigation, cf. *United States* v. *Grace*, 461 U. S. 171 (1983), it asks this Court to adopt the most confusing and constitutionally questionable interpretation of the statute that it could in order to fortify its constitutional challenge.

I

Plainly there is no need to rely on the "overbreadth" doctrine to support Time's standing to challenge the constitutionality of this statute. Time is a publisher of widely circulated news magazines. The record makes it perfectly clear that the statute impairs its ability to communicate with the public by using some illustrations that include small, but colorful reproductions of currency. There can be no doubt

concerning appellee's standing to challenge the statute's requirement that pictures of money may not use any color except black and white and must be either less than three-fourths or more than one and a half times the size of actual bills or coins. Time's own First Amendment rights are clearly implicated.

It is clear to me that Time's problems with this statute are not exacerbated in the slightest by the fact that the exception from its blanket prohibition is limited by a "purpose" requirement and a "publications" requirement or, as JUSTICE BRENNAN argues, a single requirement that merges both concepts. Under a proper construction of this provision, any picture of money that Time will disseminate would qualify as "newsworthy"—and thus satisfy the purpose requirement—as well as being contained in a "magazine"—and thus satisfy the publications requirement. Thus, to evaluate the constitutionality of the color and size restrictions as they affect Time, it is wholly unnecessary to consider the significance of either the publications or the purpose requirement for parties who are not before the Court. Cf. *Metromedia, Inc.* v. *San Diego,* 453 U. S. 490, 542–548 (1981) (STEVENS, J., dissenting in part); see also *ante,* at 649–652 (opinion of WHITE, J.). In short, while the statute might not have accommodated adequately the First Amendment rights of all individuals, if it has successfully avoided abridging Time's freedom of speech or press through the exception, Time has no stake in championing the rights of third parties regarding these issues.

## II

When § 474 was adopted, it probably occurred to no one that the statute limited legitimate communication. The post-Civil War Congress that enacted § 474 presumed that anyone printing or photographing likenesses of the currency was up to no good. The use of images of the currency for legitimate, communicative purposes was probably too eso-

teric to be deemed significant or realistic in the 19th century, and it was of the utmost concern to assure the integrity and value of the greenback—itself under attack on constitutional grounds as being inherently worthless and not suitable as legal tender, see *The Legal Tender Cases*, 12 Wall. 457 (1871) (overruling *Hepburn* v. *Griswold*, 8 Wall. 603 (1870)).

Section 474, to the extent it prohibits expression at all, does so only inadvertently and incidently. The object of § 474 is plain and has nothing whatever to do with suppressing dissemination of ideas on the basis of content or anything else. The prohibition plainly is not "aimed at any restraint of freedom of speech . . . ." *Cox* v. *New Hampshire*, 312 U. S. 569, 578 (1941). It dedicates the image Congress selected for our currency to the use for which it is lawfully intended and prohibits all others from making likenesses of that image. Section 474 itself does not turn on the content or subject matter of the message a speaker might wish to convey; it serves a significant governmental interest; and it leaves open alternative channels for communication of the information. It is subject to attack on the grounds that it serves the governmental interest too imprecisely to justify the incidental effect on communication. In short, § 474 is a restriction on the manner of expression, and if it would suffer from any constitutional infirmity, presumably it would be on the ground that it is "overbroad."

This provision stood on the books for nearly a century without modification or challenge, but as the decades passed, and the instruments of mass communication multiplied and became more sophisticated, free expression clashed with § 474. The familiar image of United States currency became a powerful symbol, to the point of perhaps becoming somewhat of a modern icon. So embedded is the freedom of speech and of the press in our governmental institutions that with no overt suggestion of a constitutional infirmity in § 474, the Treasury Department adopted the practice, without evident statutory authority, of making exceptions from the

broad prohibition in the interest of free expression on a case-by-case basis.

Section 504 is Congress' attempt to narrow whatever "overbreadth" infects § 474: Congress sought to accommodate the interests in using the symbol of the currency for free expression in the marketplace of ideas. Important as its symbolic value is, however, communication is of course not the primary purpose of the image—its primary purpose is its use in exchange transactions. A core governmental function is implicated in this case, and the compelling nature of the Government's interest is demonstrated by the fact that Art. I, § 8, cl. 6, of the Constitution expressly empowers Congress "[t]o provide for the Punishment of counterfeiting the Securities and current Coin of the United States." The dispute in this case is not over the strength of the governmental interest, but rather the extent to which it is served by the specific provision in question. In my view, however, a statute which implicates a particularly strong governmental interest need not serve that interest to the same degree to withstand constitutional scrutiny as it would if the interest were weaker. Similarly, the effectuation of that interest need not be perfect, or nearly so, if the intrusion on expression is minimal.

Congress' attempt to reconcile the competing interests, and to eliminate possibly impermissible applications of § 474, is entitled to great respect. When Congress legislates exceptions to a general prohibition to accommodate First Amendment interests, we should not adopt a grudging interpretation of the exceptions, but should liberally construe them to effectuate their remedial purposes. Congress adopted the exception in the spirit of the First Amendment; courts should construe them in the same fashion. There is a presumption in favor of the constitutionality of an Act of Congress. See, e. g., *Rostker* v. *Goldberg*, 453 U. S. 57, 64 (1981). This presumption should be particularly salient regarding a statutory scheme which on its face goes far in accommodating the interests of free expression at stake

in a statutory scheme legitimately directed at a serious substantive evil.

Generally, of course, we construe Acts of Congress to avoid constitutional questions. See, *e. g.*, *United States* v. *Clark*, 445 U. S. 23, 27 (1980). This maxim of construction is not merely based on a desire to avoid premature adjudication of constitutional issues. Like others, the maxim also reflects a judicial presumption concerning the intent of the draftsmen of the language in question. In areas where legislation might intrude on constitutional guarantees, we believe that Congress, which also has sworn to protect the Constitution, would intend to err on the side of fundamental constitutional liberties when its legislation implicates those liberties.

In this case, this belief is no mere presumption. Congress recognized, as had the Executive Branch for years, the expressive value of the image of the currency and determined that § 474 undermined such expression, sweeping within its prohibition identifiable, legitimate uses of the image. In § 504, Congress sought to excise the surplusage from the broad prohibition of § 474 to ameliorate the overbreadth of that provision. Appellee does not attack § 504 as overbroad—it argues that it is not broad enough. Stated another way, appellee contends that the impermissible applications of § 474, even with the large exception carved out by § 504, dwarf the permissible applications.

Appellee maintains that Congress failed in its attempt to accommodate First Amendment interests. Specifically, it attacks the purposes requirement and essentially contends that it has a First Amendment right to take color photographs of United States currency so long as the specific pictures it publishes cannot be passed off as the real thing.

III

*Purposes Requirement*

The Court devotes little attention to the constitutionality of the purposes requirement, brushing aside this attempt by Congress to reconcile the interest in free expression with re-

698

spect to images of the currency with the interest in protecting the integrity of that image for its primary purpose. In a paragraph, we are simply told that a determination of newsworthiness or educational value of an image of the currency must be based on the content of the message and that the Government will determine if that message is newsworthy in determining the applicability of the exception. Then the Court makes the sweeping statement that regulations permitting the Government to discriminate on the basis of content are *per se* violative of the First Amendment.[1]

I do not interpret the provision to give the Government a license to determine the newsworthiness or the value of the substantive message being conveyed. Rather, giving it the liberal construction I think it deserves, the question is merely whether the image of the currency is used for such a purpose, or stated another way, whether the image is being

---

[1] The Court makes the following statement: "Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." *Ante,* at 648–649. The Court's summary invalidation of the purposes requirement on the basis of this sweeping statement is particularly disturbing in light of the fact that Congress employed quite similar language in striking a similar balance between free expression and a governmental interest under the Copyright Act. Pursuant to the express authority of Art. I, § 8, of the Constitution, Congress established a copyright which generally vests the exclusive right to reproduce original works with the author of the work. 17 U. S. C. § 106. One who infringes that right by reproducing the work, see § 501(a), is subject to criminal prosecution, see § 506. This broad prohibition, however, is qualified. Individuals may make a "fair use" of the copyrighted works "for purposes such as criticism, comment, news reporting, teaching . . . , scholarship, or research . . . ." § 107.

To my knowledge, it has never been seriously suggested that the fair use provision of the Copyright Act is violative of the First Amendment because it allows governmental authorities to make decisions on the basis of content. Indeed, we have recognized the interests in free expression that the fair use provision was intended to serve. See generally *Sony Corp.* v. *Universal City Studios, Inc.,* 464 U. S. 417, 445–446, and n. 27, 450–451, 454–455, and n. 40 (1984). If the broad language of today's opinion were to be applied literally, perhaps this provision would be highly suspect.

used to convey information or express an idea.[2] That requirement is easily met—whenever the image is used in connection with a news article, it necessarily will comply with this condition unless the editor's use of the image bears no rational relationship to the information or idea he is trying to convey.[3] The key point is that he must be attempting to

---

[2] Cf. *Schacht v. United States*, 398 U. S. 58, 61–62, n. 3 (1970) (interpreting exception from statute making it a crime for a civilian to wear a United States military uniform for "an actor in a theatrical or motion-picture production" to be applicable to a protester in a dramatic street demonstration).

[3] The legislative history is consistent with my view that Congress, by use of the term "newsworthy," simply intended to exempt pictures of the currency used in connection with articles in publications. The House and Senate Committee Reports, quoted by JUSTICE WHITE, stated that "'[n]ewspapers quite often publish pictures of paper money or checks in connection with news articles,'" *ante*, at 655, n. 10 (citations omitted), and plainly that connection was deemed sufficient by the Congress to invoke the exemption.

Time's analysis of this statement in the legislative history is typical of its approach to this litigation. Incredibly, Time asserts that the need of members of the press to report the news was "[c]uriously absent" from the list of legitimate purposes set forth in the Committee Reports, interpreting the language quoted as a mere passing observation. Brief for Appellee 8, n. 10. Time thus asks this Court to ignore the plain import of the language of the statute and the legislative history—language which was plainly intended to benefit publications such as Time—and actually argues for a construction against its interest.

The history of § 504 makes it rather clear that Congress intended to exempt uses of pictures of money that serve a legitimate purpose and that pose no significant threat of counterfeiting or fraud. The democratic process through which § 504 was crafted resulted in a list, expanded from time to time, of exempted uses largely coterminous with the legitimate uses that actual experience demonstrated were substantial. The fact that § 504 is not still broader is attributable in part to the fact that experience did not demonstrate a substantial need for any other exceptions. This is an apt case for remembering the words of Justice Holmes: "Great constitutional provisions must be administered with caution. Some play must be allowed for the joints of the machine, and it must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as

communicate: he must be using the symbol as expression protected by the First Amendment, and not merely reproducing images of the currency for some noncommunicative purpose, *e. g.*, to facilitate counterfeiting.[4]

*Color and Size Requirements*

With respect to the cover illustrations contained in the record in this case, it would appear that Time's interest is in reproducing realistic illustrations of the currency, and the more realistic the illustration, the more effective the commu-

---

great a degree as the courts." *Missouri, K. & T. R. Co. v. May,* 194 U. S. 267, 270 (1904).

It seems clear to me that a fair interpretation of the scope of § 504 will involve substantially all legitimate uses of reproductions of currency and exclude those that are illegitimate. Moreover, the purpose request itself surely makes sense. If a Treasury agent finds a printer with negatives of currency in his possession, an inquiry is appropriate to determine the purpose those negatives were intended to serve.

JUSTICE BRENNAN is critical of my construction of the "purposes" requirement of § 504 which draws a broad distinction between legitimate and illegitimate uses of reproductions of currency. He seems to think that reading the word "newsworthy" to mean "newsworthy" is "judicial rewriting" and that it " 'pervert[s] the purpose' " of § 504 to construe it to exempt legitimate uses that had been called to the attention of Congress or the Treasury Department before it was enacted. See *ante,* at 663–664, n. 1. With all due respect, I suggest that JUSTICE BRENNAN has accepted Time's invitation to plunge headlong into the alluring waters of constitutional analysis. He construes the crucial language in the light most unfavorable to Time with an eye toward a still larger constitutional plum on the horizon—§ 474 itself, which when § 504 is invalidated, is then ironically subject to attack either on overbreadth grounds or inseverability grounds.

[4] However, if the idea to be conveyed is to advocate counterfeiting, *e. g.*, the publication of a counterfeiting manual, and the speech presents a clear and present danger of bringing about that substantive evil, the speech is unprotected under the First Amendment.

Time, it should be noted, expresses no interest in simply printing pictures of money unconnected with any message; and hence we need not decide whether the unadorned photograph of a dollar bill, expressing no other message than "this is a dollar bill," would be covered by the exception.

I should note that because I believe the purposes requirement does not offend the First Amendment, I do not reach any severability issue.

nication. However, the very heart of the Government's interest grows stronger the more realistic the illustration is. Stated another way, Time does not want to use illustrations of the currency which plainly appear spurious; the Government's precise legitimate interest is to permit only those illustrations which do plainly appear spurious. Time notes that one of these pictures may be worth a thousand words; the Government notes one of these pictures or negatives may be worth a thousand dollars.

Time particularly objects to the color requirement—it wants to print pictures of money in its actual color.[5] Time's communicative interest in printing pictures of the currency in color seems weak.[6] We are not told that use of the actual

---

[5] A color other than the actual color, or one similar to it, might be communicative under some circumstances, but the record does not indicate that Time has any interest in using other colors. Time may argue, however, that the black and white requirement is overbroad on the ground that it is irrational as applied to any color other than a color similar to the actual color of the currency. But the legitimate sweep of the statute dwarfs its arguably impermissible applications because it seems quite plain that ordinarily it is the actual color which would be selected most often. This conclusion is supported not only by the record in this case, but by common sense as well.

Time, it should be noted, argues that in most cases the expressive quality of illustrations of the currency derives principally from artistic interpretation and distortion of the image, and therefore states that "an actual-size, true-color, unembellished picture of a dollar bill . . . is of little use to Time's journalists." Brief for Appellee 3. If that is true, Time seems to be conceding it has little interest in challenging the color and size limitations, or stated another way, the color and size limitations have a de minimis impact on its ability to communicate effectively.

[6] The front of United States currency is not very colorful in any event. Aside from the serial numbers and the Seal of the Department of the Treasury, which are a rather vivid green, the rest of the image borders on being black and white itself. The difference between printing a black and white image of it and and color image of it would have a de minimis impact on the value of the image for communicative purposes, compare App. 17 (black and white likeness of a thousand dollar bill) with an actual one dollar bill, but would have a significant impact on the value of the image for fraudulent or deceptive purposes. While it may be that only the most gullible

color of the currency expresses an idea itself, aside from communicating information about the color of the currency. But that is not necessary to communicate the substantive ideas Time is attempting to convey, any more than the size of the bill must be communicated by showing its actual size. The use of the bill's actual color adds little if anything to the message, particularly because the currency itself is not especially colorful.

A reproduction which meets the size requirements, to be sure, advances the Government interest in preventing deception, but the color requirement advances the interest as well, in a manner that is independent of the size requirement. Imposing both requirements reduces the likelihood of the evil Congress legitimately desired to prevent to a greater extent than imposing just one of the requirements.

To argue, as does Time, that the color requirement is invalid would invalidate the size requirement as well. Time argues that the color requirement is invalid because some of its covers violate the color requirement and yet "none of them has the remotest capacity for deception or could otherwise be used to make a counterfeit." Brief for Appellee 43. The same argument could be made if the covers violated the size requirement. The reasons Time points to in arguing that its covers pose no real risk as instruments for fraud—such factors as the kind of paper used for its covers, and the fact that images of the bills are partially obscured or distorted—would be equally applicable if Time violated both the color and size requirements. The point is that whatever capacity the covers have as instruments of deception is

---

among us—those who might indeed take a proverbial wooden nickel—could possibly be duped into accepting a cutout from a Time magazine cover as the genuine article even if it were the same size and same color as a thousand dollar bill, since it is on a different kind of paper and is printed on only one side, Congress apparently thought that the existence of the negatives and color plates pose a real threat of counterfeiting.

necessarily enhanced if the bill is shown in its actual color, just as it is enhanced if the bill is reproduced in its actual size.

Moreover, Time all but ignores the potential variety of ways in which a negative could be used for illegitimate purposes. The size requirement is meaningless, or always met, with respect to a negative. The point, of course, is that a negative that makes a print meeting the size requirement can also make a print the exact size of a bill. If it is a black and white negative, all that can be produced is a black and white reproduction of the bill; if it is a color negative, a color reproduction may be made. The fact that the bill is partially obscured in the photographs or even in the negatives is not dispositive; the statute prohibits making color photographs of even parts of bills for a reason.[7]

The statute at issue in this case is but one part of a comprehensive scheme to be sure; but that cannot render it susceptible to invalidation on the ground that the other portions of the scheme largely meet the governmental interest. The fact that there are other statutes available to punish counterfeiters does not negate the Government's interest here; Congress may provide "alternative statutory avenues of prosecution to assure the effective protection of one and the same interest." *United States* v. *O'Brien,* 391 U. S. 367, 380

---

[7] If the numerals on the bill are not obscured, for example, a color negative of that bill could be used to reproduce copies of those numerals in the correct size and in color on paper resembling that used in real currency and then affixed to a lower denomination bill, airbrushing the borderlines to complete the deceptive instrument. Moreover, it is no answer to say that for any given photograph used in preparing any given cover, all of the corners are not shown, as they are, for example, in the hundred dollar bills shown in Exhibit F to the complaint, App. 23. All of the numerals may not be necessary for perpetrating a fraud; and the patient counterfeiter or con-artist in the printshop may bide his time, making prints from the negatives as they become available. It is no answer to say that the criminal would do better to take his own color photographs, see *ante,* at 688–690, n. 27, for in doing so he would be violating this statute.

704

(1968). This statute protects the gullible as well as the shrewd, and the Government need not wait until near perfect forgeries are rolling off the presses to act.

In conclusion, this statute is one weapon in an arsenal designed to deprive would-be counterfeiters and defrauders of the tools of deception and, given the strength of the state interest and the presumption of constitutionality which attaches to an Act of Congress, I believe the color and size requirements are permissible methods of minimizing the risk of fraud as well as counterfeiting, and can have only a minimal impact on Time's ability to communicate effectively.

It may well be, as Time argues, that "Congress can do a much better job in preventing counterfeiting than the present § 474 and § 504," Brief for Appellee 46. The question for us, of course, is not whether Congress could have done a better job, but whether the job it did violates Time's right to free expression. It does not: Time is free to publish the symbol it wishes to publish and to express the messages it wishes to convey by use of that symbol; it merely must comply with restrictions on the manner of printing that symbol which are reasonably related to the strong governmental interests in preventing counterfeiting and deceptive uses of likenesses of the currency.

Accordingly, I concur in the judgment of the Court in part, and dissent in part.