**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Steven M. KENNY, Defendant–Appellant.**

**No. 92–3722.**

United States Court of Appeals,
Seventh Circuit.

Argued May 12, 1993.

Decided Sept. 13, 1993.

Barry R. Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, Scott A. Verseman, Rockford, IL (argued), for plaintiff-appellee.

Joseph J. Bruce, Rockford, IL (argued), for defendant-appellant.

Before BAUER, Chief Judge, KANNE, and ROVNER, Circuit Judges.

BAUER, Chief Judge.

Steven Kenny was convicted of violating federal counterfeiting laws, 18 U.S.C. §§ 471 & 474. He appeals his conviction and his sentence. We affirm.

### I.

In December 1990, Steven Kenny went to Advanced Business Machines ("ABM"), a store that leases and sells office equipment, in Rockford, Illinois, to rent a photocopier. He told the ABM salesman that he was starting a low volume mail order business. Kenny rented a Konica 1290 copier that had the capability of copying in more than one color. The colors had to be copied separately, and each time the colors changed, the toner unit and imprint drum had to be switched. The copier came with a black toner unit and imprint drum and Kenny ordered a green toner unit and imprint drum from ABM to supplement his materials. (Tr. 34–51).

A few months later Kenny brought the photocopier in to be serviced. In the course of repairing the machine, the ABM service technician removed the imprint drum. The drum retains the imprint of the last item that it copies. The imprint on the drum was that of a $100 bill with the serial numbers obscured. The technician became suspicious and inspected other parts of the copier. He found that while most copiers' fuser cleaner rollers are black from making $8\frac{1}{2}'' \times 11''$ copies, this fuser cleaner roller was only black in a small area—an area the same width as a Federal Reserve Note. The technician also noticed that the glass plate upon which originals are laid to be copied had tape marks on it. The technician put a dollar bill in the area blocked out by the tape marks, and the tape outline matched the money's dimensions exactly. The technician discussed his findings with other ABM employees and notified the FBI. (Tr. 68–78). The FBI notified the United States Secret Service.

Secret Service agents examined the machine while it was at ABM for servicing and suspected that Kenny might be counterfeiting, a logical deduction. They followed Kenny when he took the machine home, then obtained a search warrant for his house. Inside they found that Kenny had been doing more in his dining room than eating; rather, it appeared to be the center of his counterfeiting operations. The copier was there, as well as blank white paper that had been tinted to a dull off-white color. A Bible in the dining room contained two counterfeit Federal Reserve Notes. The Bible also contained real Federal Reserve Notes. Some of the real notes were tampered with to expose the seals and serial numbers and obscure the rest of the note. The others were tampered with to expose the entire note except for the seals and serial numbers. (Tr. 88–107, Govt. Exh. 11G–11L).

The evidence was not confined to the dining room. In the bedroom, the agents found a pile of impressions of the front of a $50 bill in a dresser drawer. The dresser also contained other impressions of United States currency and a stack of painted paper that bore impressions of United States Treasury

seals and serial numbers for United States currency. More impressions of United States currency were found inside a box in the closet. Housed in another bedroom was a cedar chest that contained more tinted paper packed with a drying agent. In the basement, the agents found paint, paint mixtures, a paper cutter, an eraser, masking tape, "white-out", scissors, and a clothesline with paint drops spattered beneath. (Tr. 117–125/141–162).

Kenny was arrested and, after being given his *Miranda* warnings, he dictated and signed a statement to a Secret Service agent. In the statement, Kenny described his process for making the bogus currency. He also estimated that he had produced $10,000 in counterfeit bills. Kenny initialed this figure to show that it was accurate. (Tr. 185–188). In the course of his statement, he stated that he was pursuing a mail order business. (Tr. 189).

Kenny was charged in a two-count indictment. Count I charged that Kenny "with intent to defraud, did falsely make, forge and counterfeit obligations of the United States" in violation of 18 U.S.C. § 471. Count II charged that Kenny "unlawfully did print, photograph, make, and execute photographs, prints, and impressions in the likeness of obligations issued under the authority of the United States and parts of such obligations" in violation of 18 U.S.C. § 474.

At trial before a jury, Kenny claimed that he was reproducing currency as a part of a direct mail advertisement for a lottery publication he was planning to develop. (Tr. 303). He based his strategy on examples of advertisements that incorporated images of United States currency. (Def.Exh. E1–E15). Kenny claimed that he needed to copy large denomination bills because that would be an attention grabber for Lottery players, (Tr. 303, 307), and even presented an example of the publication at trial. Kenny testified that the example was one of his first ideas for the publication. (Tr. 305). It had a cover with an actual dollar bill glued to it. He claimed that the publication was in his home when it was searched by federal agents. (Def.Exh. G–1, Tr. 308). The government called a witness from the Bureau of Engraving and Printing who testified that the dollar bill that Kenny claimed to have glued to the front of his booklet before April 1, 1991 was not in circulation until October 16, 1991. The jury convicted Kenny of both counts in the indictment.

## II.

### A. The Jury Instructions

■ Kenny argues that the jury was improperly instructed about the intent requirements necessary for conviction under 18 U.S.C. § 474. We look at all the jury instructions to determine whether they fairly and adequately dealt with the issues presented at trial. We will reverse a conviction only if the instructions, as a whole, denied the defendant a fair trial. *United States v. Severson,* 3 F.3d 1005, 1011 (7th Cir.1993).

Kenny specifically challenges the jury instruction on Count II of the indictment. That count charged him with violating paragraph six of section 474, which states:

Whoever prints, photographs, or in any other manner makes or executes any engraving, photograph, print, or impression in the likeness of any such obligation or other security, or any part thereof, or sells any such engraving, photograph, print, or impression, except to the United States, or brings into the United States, any such engraving, photograph, print, or impression, except by direction of some proper officer of the United States—Is guilty of a class C Felony.

18 U.S.C. § 474. The instruction given to the jury addressing section 474 stated:

To sustain the charge of unlawfully printing, photographing, making, and executing photographs, prints and impressions in the likeness of Federal Reserve notes or parts of Federal Reserve notes, as charged in Count Two, the government must prove the following propositions:

First: that the defendant made or executed prints or impressions in the likeness of Federal Reserve notes or parts of Federal Reserve notes; and

Second: that he did so knowingly.

If you find from your consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt, then you should find the defendant guilty.

If, on the other hand, you find from your consideration of all of the evidence that any of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant not guilty.

(R. 37). Kenny argues that the government must prove that he willfully violated the statute, or at least knew that the impression was unlawfully made. Section 474 does not, however, denote willfulness as the intent requirement of the offense.

The government argues that the Kenny need only know that he was making an impression in the likeness of a government obligation to be convicted under section 474. The government denies that the statute requires Kenny to know that his conduct was unlawful. As support for its argument, it cites the various intent requirements within different paragraphs of section 474. The statute consists of six paragraphs, and each paragraph gives its own intent requirement. The government argues persuasively that if Congress had intended to attach a greater *mens rea* requirement to paragraph six, it would have done so.

The government also cites a Ninth Circuit case on this issue. *United States v. Green*, 962 F.2d 938, 943 (9th Cir.1992). There, the court of appeals considered the same argument that Kenny presents: that the jury instructions for alleged violations of paragraph six of section 474 must reflect a "willful" intent requirement. The Ninth Circuit rejected this argument, recognized that the statute did not contain such a requirement, and pointed out two other federal cases holding the same. *Id.* (citing *Webb v. United States*, 216 F.2d 151, 152 (6th Cir.1954); *Wagner v. Simon*, 412 F.Supp. 426, 430 (W.D.Mo., 1974), *aff'd*, 534 F.2d 833 (8th Cir.1976) (adopting the district court opinion)). The court went on to state that a Supreme Court case interpreting the statute in conjunction with another "exceptions" statute also did not impose a greater intent requirement than that reflected in the stat-

ute. *Id.* (citing *Regan v. Time, Inc.*, 468 U.S. 641, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984)).

■ We find *Green* persuasive. Willfulness is not an element of section 474. Because the jury instruction addressed the essential elements of section 474, the district court was not required to give an additional instruction on willfulness. *United States v. Rice*, 995 F.2d 719, 724 (7th Cir.1993).

■ Kenny also challenges a second jury instruction which is a modified version of *Federal Criminal Jury Instructions of the Seventh Circuit* § 6.04 (Vol. I, 1980). That instruction reads:

When the word "knowingly" is used in these instructions, it means that the defendant realized what he was doing and was aware of the nature of his conduct, and did not act through ignorance, mistake or accident. Knowledge may be proved by the defendant's conduct, and by all the facts and circumstances surrounding the case.

The government is not required to prove that the defendant knew that his acts or omissions were unlawful.

The model instruction did not include the sentence stating that the government did not have to prove Kenny knew he acting unlawfully.

Kenny argues that the district court improperly modified the model instruction when it included the additional sentence. He claims that the additional language put undue emphasis on what the government did not have to prove rather than what it had to prove.

The district court has broad discretion in choosing the precise language of its jury instructions. *Rice*, 995 F.2d at 724. A review of the transcripts from the jury instruction conference reveals that the district court felt that the additional language clarified the intent element of the section 474 offense. (Govt. Brief Appendix A). The court attempted to avoid confusion about whether "knowingly" applied to making a likeness of a Federal Reserve · Note or to breaking the law. In addition, the statement merely restates the age old proposition that ignorance of the law is no defense. *Cheek v. United*

*States,* 498 U.S. 192, 199, 111 S.Ct. 604, 609, 112 L.Ed.2d 617 (1991) (citing *United States v. Smith,* 18 U.S. (5 Wheat.) 153, 182, 5 L.Ed. 57 (1820)). That is an accurate statement of the law and does not affect the overall fairness and adequacy of the jury instructions.

*B. The Sentence*

 Kenny argues that the district court erred by refusing to reduce his sentence two levels for acceptance of responsibility pursuant to § 3E1.1 of the United States Sentencing Guidelines. Whether Kenny accepted responsibility for his crimes is a factual question, and we will affirm the district court's decision unless it is clearly erroneous. *United States v. Reno,* 992 F.2d 739, 744 (7th Cir.1993). When the district court denied Kenny's motion for a reduction it stated: "The court finds defendant has not accepted responsibility and has put the United States to its proofs at trial by denying certain factual elements of the offense and the intent charged in Count I." (Findings of Oct. 26, 1992).

Count I charged Kenny with a violation of section 471. That section required the government to prove that Kenny intended to defraud someone with the bogus currency he produced. In his statements at trial and to the Secret Service agent when he was arrested, Kenny denied that he intended to defraud anyone with the fake currency. Instead, he argued that he was using it for a direct mail promotion of a lottery publication he was developing. After he was convicted, however, Kenny submitted a statement to the district court that inferred (but did not acknowledge) that he intended to use the counterfeit money to defraud. In that statement he said that he began making photocopies of the currency because he felt his job situation was uncertain and he was "concerned about [his] financial future." (Kenny Brief, Appendix F).

Kenny's situation mirrors an example of when a decrease should *not* be awarded that is found in Application Note Two to § 3E1.1. It states:

> This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse.

The district court followed the Guidelines, and did not err when it denied Kenny's motion for a reduction pursuant to § 3E1.1. *United States v. Agrell,* 965 F.2d 222, 228 (7th Cir.1992).

### III.

Kenny's conviction and sentence are AF-FIRMED.